Electronically Filed - St Louis County - August 21, 2017 - 08:28 AM

**IN THE CIRCUIT COURT OF ST. LOUIS COUNTY**
**STATE OF MISSOURI**

| | |
|---|---|
| **MARK W. DUBUQUE**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**THE BOEING COMPANY**<br><br>**Serve**<br>**Registered Agent**<br>**CSC-Lawyers Incorporating Service Company**<br>**221 Bolivar Street**<br>**Jefferson City, MO 65101**<br><br>**-and-**<br><br>**CHRIS WEDEWER**<br><br>**Serve**<br>**2924 Isle View Ln.**<br>**St. Charles, MO 63303**<br><br>**-and-**<br><br>**TODD BURNS**<br><br>**Serve**<br>**1402 Powder Dr.**<br>**St. Paul, MO 63366**<br><br>**Defendants.** | **Cause No.** ____________<br><br>**Division** ____________ |

**PETITION**

COMES NOW Plaintiff, Mark W. Dubuque, by and through undersigned counsel, and, for his Petition against Defendants The Boeing Company, Chris Wedewer and Todd Burns, states as follows:

Electronically Filed - St Louis County - August 21, 2017 - 08:28 AM

1. Plaintiff Mark. W. Dubuque ("Dubuque") is a resident of St. Louis County, Missouri.

2. Defendant The Boeing Company ("Boeing") is a foreign corporation registered to do business in the State of Missouri and is doing business in St. Louis County, Missouri.

3. Dubuque, at all relevant times herein, was and is an employee of Boeing at Boeing's offices in St. Louis County, Missouri.

4. Defendant Chris Wedewer ("Wedewer") is an employee of Boeing at Boeing's offices in St. Louis County, Missouri and is, upon information and belief, a resident of St. Charles County, Missouri.

5. Wedewer is an executive of Special Programs within the Global Strike division of Boeing Military Aircraft.

6. Defendant Todd Burns ("Burns") is an employee of Boeing at Boeing's offices in St. Louis County, Missouri and is, upon information and belief, a resident of St. Charles County, Missouri.

7. Wedewer is Burns's supervisor.

8. Burns, at all relevant times herein, was Dubuque's supervisor.

9. The conduct of Burns and Wedewer alleged herein occurred in St. Louis County, Missouri.

10. Jurisdiction is appropriate in this Court, pursuant to Article V, Section 14 of the Missouri Constitution.

11. Venue is appropriate in this Circuit, pursuant to Mo. Rev. Stat. § 508.010.

Electronically Filed - St Louis County - August 21, 2017 - 08:28 AMM

12. Prior to December 2013, Dubuque possessed active Special Action Program (SAP) clearances for purposes of his highly classified work at Boeing.

13. A SAP is a security protocol that provides highly classified information with safeguards and access restrictions that exceed those for regular classified information.

14. It goes without saying that a recipient of a SAP is highly vetted, and is deemed reliable and trustworthy by his employer (*i.e.*, Boeing) and the United States Government.

15. A SAP recipient's career and livelihood are dependent upon maintaining his SAP access, because, without SAP clearances, the SAP recipient cannot carry out the work that he is uniquely trained to perform.

16. In February 2013, based upon the recommendation of Wedewer, Boeing acquired the Acalis microprocessor business ("Acalis") from CPU Technology, Inc.

17. Following the acquisition, what once was Acalis became a division of Boeing.

18. On February 22, 2013, Boeing issued a press release which provided, in part:

> Boeing [NYSE: BA] today continued to address its global customers' enduring need to protect warfighters from information-assurance attacks by acquiring CPU Technology Inc.'s Acalis business. Acalis microprocessors contain unique hardware and software that can guard mission-critical onboard systems in Boeing platforms. "Acalis provides security-on-a-chip that can help defend the manned and unmanned aircraft we build at Boeing today and in the future for customers around the world," said Chris Chadwick, president of Boeing Military Aircraft. "With these processors onboard, warfighters can complete their missions and not be sidelined by malware, cloning and other cyber threats against the aircraft's systems." Acalis will be integrated into Boeing Military Aircraft's Global Strike division. The Acalis business employs approximately 40 people and is based in Pleasanton, Calif.

Electronically Filed - St Louis County - August 21, 2017 - 08:28 AMM

19. In a July 2013 edition of "Boeing Frontiers," Wedewer is quoted as stating:

> Whether it's in the air or down on the ground, an adversary seeks to either acquire our technology or be able to access it electronically so they can then build or reverse-engineer it without having to invest in research and development as we did. Because of that, our military customers continue to increase security requirements for our products.

20. The July 2013 edition of "Boeing Frontiers" further described the purpose of the Acalis acquisition and the intentions for use of the Acalis assets going forward:

> That is why Boeing, in February, acquired the maker of the Acalis microprocessor. That's right: Boeing now produces computer chips. But these chips aren't going in a personal computer anytime soon. Acalis and the 40 now-Boeing employees who design and engineer the chips near Silicon Valley in California provide a key deterrent against electronic information attacks. It's a growing need and requirement from customers around the world. Boeing Defense, Space & Security is focused on growing revenues globally, and a unique technology such as Acalis furthers that growth, said Debbie Rub, vice president and general manager of Global Strike. "Our strategy is to integrate Acalis into a range of current and future systems as a critical enabler."

21. Wedewer's reputation, performance goals and, upon information and belief, executive compensation were and are dependent upon the success and longevity of the Acalis chips, the revenue generated from the sale of the chips, and Boeing's ability to, as planned, integrate Acalis into other Boeing projects.

22. Production and use of the Acalis chips was and is expensive for Boeing.

23. Unless Wedewer can convince other Boeing sites and systems to use the chips in their products and, thus, share the cost of production with his division, the substantial cost would have to be passed on to Wedewer's division's customers, something those customers would, needless to say, not appreciate.

Electronically Filed - St Louis County - August 21, 2017 - 08:28 AMM

24. Some of Dubuque's unclassified job duties at Boeing included working with commercial industries to mature anti-tamper technology and to recommend to Boeing anti-tamper solutions.

25. Within the scope of those duties, in 2013, Dubuque, on numerous occasions, informed Wedewer and other employees at other Boeing sites outside of St. Louis, Missouri that a third-party ("Third-Party") had a part that was cheaper, more flexible and reliable, and had better performance than Boeing's Acalis chips.

26. Immediately thereafter, Wedewer and Burns began treating Dubuque differently.

27. On November 21, 2013, Boeing requested that Dubuque meet with a "customer" on November 26, 2013.

28. On November 26, 2016, Dubuque walked into a room, expecting to meet with a "customer," only to find two (2) agents from the Air Force Office of Special Investigations ("AFOSI"). Those agents immediately began interrogating Dubuque as to his relationship with Third-Party and accusing Dubuque of disclosing classified information and deleting documents from his computer. In all, the agents' interrogation of Dubuque on that day lasted almost (6) hours. That same day the investigators went to Dubuque's home to take and copy his work and personal computers.

29. Knowing he had done nothing wrong, Dubuque was surprised, stunned and confused as to why he was being interrogated over such grave, false allegations.

30. On December 10, 2013, AFOSI agents returned to Boeing and conducted a lengthy polygraph of Dubuque. During the polygraph, Dubuque was again asked, among other things, about his relationship with Third-Party, whether he had mishandled

Electronically Filed - St Louis County - August 21, 2017 - 08:28 AM

classified data, whether he had deleted files from his computer, and whether he was trying to "sabotage" his program.

31. At the conclusion of the polygraph, after accusing Dubuque of lying to them, the agents orally told Dubuque that his SAP clearances were suspended.

32. Between December 2013 and January 2016, upon inquiry from Dubuque, Boeing stated to Dubuque that the AFOSI inquiry was instigated as a result of issues raised by the Government—*not Boeing*.

33. In the weeks following his SAP suspension, Dubuque was labeled as a security risk by other programs and individuals at Boeing, despite the fact that Dubuque was completely unaware as to what he possibly could have done wrong.

34. The AFOSI investigation continued into 2014 and/or 2015. In the meantime, Dubuque was relegated to performing non-SAP related duties at Boeing and essentially given no information as to the status of the investigation by Boeing or instruction as to how to proceed.

35. In March 2015, Dubuque filed Freedom of Information Act ("FOIA") requests with AFOSI and the Department of the Air Force. Both FOIA requests sought, among other things:

a. Documents relating to Dubuque's clearance to work on any SAP;

b. All documents relating to an inquiry or investigation of Dubuque conducted by the AFOSI, which began in 2013 and which continued into 2014 and/or 2015;

c. Any and all documents pertaining to oral communications concerning Dubuque between the Boeing and the United States; and

Electronically Filed - St Louis County - August 21, 2017 - 08:28 AMM

d. Any communications to, from, or with Boeing concerning the investigation.

36. On January 8, 2016, after Dubuque initiated a FOIA lawsuit against AFOSI and the Department of the Air Force, FOIA and the Department of the Air Force finally provided Dubuque with AFOSI's entire investigation file ("File"), except for information and/or documents withheld pursuant to purported exemptions.

37. Upon reviewing the File, Dubuque learned, for the first time, that it was Boeing (specifically, Wedewer and Burns)—not AFOSI—that instigated and exacerbated the investigation by AFOSI.

38. In particular, the investigation was commenced and exacerbated as a result of certain false statements made by Wedewer and Burns to AFOSI that Dubuque had improper relationships with Third-Party, unlawfully disclosed classified information and unlawfully deleted files from his computer (collectively, "Statements").

39. The File also disclosed that, after an extensive investigation, AFOSI found no evidence of wrongdoing on the part of Dubuque.

40. For example, the files that Wedewer and Burns told AFOSI that Dubuque deleted were immediately located by AFOSI. Indeed, a simple check by Wedewer, Burns, or anyone at Boeing for that matter, would have uncovered that the files were not deleted.

41. Nonetheless, despite AFOSI finding no evidence of wrongdoing, Dubuque's SAP access purportedly remains suspended and Dubuque's career remains in a state of perpetual limbo.

Electronically Filed - St Louis County - August 21, 2017 - 08:28 AMM

**COUNT I – Declaratory Judgment**
**(against Boeing)**

42. Dubuque incorporates the allegations contained in paragraphs 1 through 41, as though fully stated herein.

43. Pursuant to Missouri Revised Statutes § 527.010, *et seq.*, and Missouri Supreme Court Rule 87, this Court has the authority to declare and determine the rights, status and obligations of the parties herein.

44. Beginning in 2015, Boeing began demanding that Dubuque be debriefed on his SAP programs and that such debriefing occur in a classified SAP room.

45. Debriefing typically occurs at the conclusion of a SAP program, at which each person with SAP access is, by law, among other things, (a) reminded of his obligations not to disclose classified information; (b) reminded of the penalties for espionage; (c) told where to report suspected Foreign Intelligence Service contacts; and (d) given the ability to ask questions and receive substantive answers from the person providing the debriefing.

46. Dubuque orally, and through counsel, informed Boeing that it would be unlawful for him to be debriefed, because his access was currently suspended. In particular, because he was suspended, he could not be debriefed in a SAP classified room. And, even if he could, his SAP suspension precluded him from asking the questions and receiving the substantive answers he was authorized to ask/receive under SAP debriefing protocols and regulations, including, among other things, the Joint Air Force—Army—Navy Special Access Program Security Manual (JAFAN) and Department of Defense Manual Number 5205.07, Volume 2, November 24, 2015

Electronically Filed - St Louis County - August 21, 2017 - 08:28 AMM

entitled "Special Access Program (SAP) Security Manual: Personnel Security," both of which are publically available documents.

47. Nonetheless, Boeing continued and continues to demand that Dubuque be unlawfully debriefed.

48. In October 27, 2015, Dubuque left work on medical leave, as a direct result of the emotional distress suffered as a result of the investigation.

49. After his return to work, Boeing again demanded that he be debriefed under the same conditions previously requested.

50. As a result, Dubuque again left on medical leave. Dubuque is scheduled to return to work the week of February 22, 2016.

51. While on medical leave, Dubuque has had to use his accrued sick leave in order to continue to receive a paycheck.

52. Not only would it be unlawful for Dubuque to be debriefed under the conditions demanded by Boeing, but according to the records provided by AFOSI to Dubuque, AFOSI has expressly ordered Boeing *not* to debrief Dubuque.

53. Dubuque does not want to violate any laws, or mandates of AFOSI, by agreeing to be debriefed in a SAP classified room and while his SAP access is suspended.

54. Dubuque is fearful that Boeing will take adverse employment actions against him upon his return to work, if he continues to refuse to be debriefed under the conditions requested by Boeing.

55. A real, substantial, justiciable and present controversy exists between Dubuque and Boeing, who have genuinely adverse interests.

Electronically Filed - St Louis County - August 21, 2017 - 08:28 AM

56. Dubuque has a legally protectable interest at stake.

57. The interest of Dubuque will be adversely affected absent a declaration by this Court.

58. A declaration by this Court will terminate the controversy between Dubuque and Boeing with respect to whether Dubuque may presently be debriefed.

59. Such controversy is ripe for judicial determination.

60. Dubuque has no adequate remedy at law and to grant the relief herein prayed for will avoid a multiplicity of suits.

61. This Court should declare that Boeing may not lawfully debrief Dubuque until his SAP access has been restored and AFOSI has expressly authorized Boeing to debrief Dubuque.

62. This Court should further declare that Boeing shall not take any adverse employment action against Dubuque as a result of Dubuque refusing to be debriefed, until his SAP access has been restored and AFOSI has expressly authorized Boeing to debrief Dubuque.

Wherefore Dubuque prays that the Court:

(a) enter judgment in his favor and against Boeing on Count I;

(b) declare that Boeing is not authorized to debrief Dubuque, until his SAP access is reinstated;

(c) declare that Boeing may not take any adverse employment action, as a result of Dubuque’s refusing to be debriefed, until his SAP access has been restored and AFOSI has expressly authorized Boeing to debrief Dubuque;

Electronically Filed - St Louis County - August 21, 2017 - 08:28 AM

(d) award Dubuque his costs and attorneys' fees; and

(e) grant such other and further relief as the Court deems just and appropriate.

**COUNT II – Intentional Infliction of Emotional Distress (against Burns)**

63. Dubuque incorporates the allegations contained in paragraphs 1 through 62, as though fully stated herein.

64. The actions of Burns in making the false Statements to AFOSI were intentional and/or Burns acted recklessly in making them.

65. The actions of Burns in making the false Statements to AFOSI were solely for the purpose of causing Dubuque extreme and severe emotional distress, in response to, among other things, Burns and Wedewer's dissatisfaction with Dubuque's statements concerning and promotion of Third-Party's competing products.

66. The actions of Burns in making the false Statements to AFOSI were extreme and outrageous.

67. As a direct and proximate result of the above-mentioned conduct, Dubuque has suffered severe mental, emotional and psychological distress and bodily harm, including but not limited to (a) being diagnosed with Post-Traumatic Stress Disorder (PTSD), fainting, weight loss, insomnia, depression, inability to cope with stress, isolation, reduced socialization, loss of trust, and feeling threatened; (b) incurring health care provider costs; and (c) continuing to incur health care provider expenses in the future in sums not presently ascertainable.

68. The above-mentioned distress is medically diagnosable and of sufficient severity so as to be medically significant.

Electronically Filed - St Louis County - August 21, 2017 - 08:28 AMM

69. Burns should have realized that his conduct involved unreasonable risk of causing distress to Dubuque.

70. As a direct and proximate result of the above-mentioned conduct, Dubuque has suffered damages in an amount exceeding $25,000.00.

71. The actions of Burns were outrageous because of Burn's evil motive or reckless indifference to the rights of Dubuque, thereby justifying the imposition of punitive damages.

Wherefore Dubuque prays that the Court enter judgment in his favor and against Burns on Count II, award Dubuque damages in a fair and reasonable amount and exceeding $25,000.00, award punitive damages in such sum as will punish Burns and deter Burns and others from similar or like conduct, award pre- and post-judgment interest and costs, and grant any further and additional relief that the Court deems just and appropriate.

**COUNT III – Intentional Infliction of Emotional Distress**
**(against Wedewer)**

72. Dubuque incorporates the allegations contained in paragraphs 1 through 71 as though fully stated herein.

73. The actions of Wedewer in making the false Statements to AFOSI were intentional and/or Wedewer acted recklessly in making them.

74. The actions of Wedewer in making the false Statements to AFOSI were solely for the purpose of causing Dubuque extreme and severe emotional distress, in response to, among other things, Burns and Wedewer's dissatisfaction with Dubuque's statements concerning and promotion of Third-Party's competing products.

Electronically Filed - St Louis County - August 21, 2017 - 08:28 AMM

75. The actions of Wedewer in making the false Statements to AFOSI were extreme and outrageous.

76. As a direct and proximate result of the above-mentioned conduct, Dubuque has suffered severe mental, emotional and psychological distress and bodily harm, including but not limited to (a) being diagnosed with Post-Traumatic Stress Disorder (PTSD), fainting, weight loss, insomnia, depression, inability to cope with stress, isolation, reduced socialization, loss of trust, and feeling threatened; (b) incurring health care provider costs; and (c) continuing to incur health care provider expenses in the future in sums not presently ascertainable.

77. The above-mentioned distress is medically diagnosable and of sufficient severity so as to be medically significant.

78. Wedewer should have realized that his conduct involved unreasonable risk of causing distress to Dubuque.

79. As a direct and proximate result of the above-mentioned conduct, Dubuque has suffered damages in an amount exceeding $25,000.00.

80. The actions of Wedewer were outrageous because of Wedewer's evil motive or reckless indifference to the rights of Dubuque, thereby justifying the imposition of punitive damages.

Wherefore Dubuque prays that the Court enter judgment in his favor and against Wedewer on Count III, award Dubuque damages in a fair and reasonable amount and exceeding $25,000.00, award punitive damages in such sum as will punish Wedewer and deter Wedewer and others from similar or like conduct, award pre- and post-

Electronically Filed - St Louis County - August 21, 2017 - 08:28 AMM

judgment interest and costs, and grant any further and additional relief that the Court deems just and appropriate.

**COUNT IV Intentional Infliction of Emotional Distress (against Boeing)**

81. Dubuque incorporates the allegations contained in paragraphs 1 through 80 as though fully stated herein.

82. At all times relevant herein, Burns and Wedewer were acting within the scope and course of their employment with and as agents of Boeing, and, as such, Boeing is vicariously liable (respondeat superior liability) for Burns and Wedewer's conduct and jointly and severally liable with Burns and Wedewer.

83. Boeing controls and had a right to control the manner and means of Burns and Wedewer's conduct herein, Burns and Wedewer's conduct was done to serve the interests of Boeing, and Burns and Wedewer's actions were carried out on Boeing property.

84. In addition, agents and representatives of Boeing made additional statements to AFOSI, including that Dubuque refused to sign a form acknowledging his SAP suspension, which was untrue and misleading ("Boeing Statement") and served to exacerbate and lengthen the investigation. The Boeing Statement, like the Statements of Burns and Wederwer, was intentional, reckless extreme and outrageous, and done with the sole purpose of inflicting severe emotional distress on Dubuque.

85. As a direct and proximate result of the above-mentioned conduct, Dubuque has suffered severe mental, emotional and psychological distress and bodily harm, including but not limited to (a) being diagnosed with Post-Traumatic Stress Disorder (PTSD), fainting, weight loss, insomnia, depression, inability to cope with

Electronically Filed - St Louis County - August 21, 2017 - 08:28 AMM

stress, isolation, reduced socialization, loss of trust, and feeling threatened; (b) incurring health care provider costs; and (c) continuing to incur health care provider expenses in the future in sums not presently ascertainable.

86. The above-mentioned distress is medically diagnosable and of sufficient severity so as to be medically significant.

87. Boeing should have realized that its conduct involved unreasonable risk of causing distress to Dubuque.

88. As a direct and proximate result of the above-mentioned conduct, Dubuque has suffered damages in an amount exceeding $25,000.00.

89. The actions of Boeing were outrageous because of Boeing's evil motive or reckless indifference to the rights of Dubuque, thereby justifying the imposition of punitive damages.

Wherefore Dubuque prays that the Court enter judgment in his favor and against Boeing on Count IV, declare Boeing jointly and severally liable with Burns and Wedewer, award Dubuque damages in a fair and reasonable amount exceeding $25,000.00, award punitive damages in such sum as will punish Boeing and deter Boeing and others from similar or like conduct, award pre- and post-judgment interest and costs, and grant any further and additional relief that the Court deems just and appropriate.

**COUNT V – Negligent Infliction of Emotional Distress**
**(against Burns)**

90. Dubuque incorporates the allegations contained in paragraphs 1 through 89 as though fully stated herein.

91. Burns has a legal duty to protect Dubuque from injury.

Electronically Filed - St Louis County - August 21, 2017 - 08:28 AM

92. As noted above, Burns breached the above-mentioned duty.

93. As a direct and proximate result of the above-mentioned conduct, Dubuque has suffered severe mental, emotional and psychological distress and bodily harm, including but not limited to (a) being diagnosed with Post-Traumatic Stress Disorder (PTSD), fainting, weight loss, insomnia, depression, inability to cope with stress, isolation, reduced socialization, loss of trust, and feeling threatened; (b) incurring health care provider costs; and (c) continuing to incur health care provider expenses in the future in sums not presently ascertainable.

94. The above-mentioned distress is medically diagnosable and of sufficient severity so as to be medically significant.

95. Burns should have realized that his conduct involved unreasonable risk of causing distress to Dubuque.

96. As a direct and proximate result of the above-mentioned conduct, Dubuque has suffered damages in an amount exceeding $25,000.00.

Wherefore Dubuque prays that the Court enter judgment in his favor and against Burns on Count V, award Dubuque damages in a fair and reasonable amount and exceeding $25,000.00, award pre- and post-judgment interest and costs, and grant any further and additional relief that the Court deems just and appropriate.

**COUNT VI – Negligent Infliction of Emotional Distress (against Wedewer)**

97. Dubuque incorporates the allegations contained in paragraphs 1 through 96 as though fully stated herein.

98. Wedewer has a legal duty to protect Dubuque from injury.

99. As noted above, Wedewer breached the above-mentioned duty.

Electronically Filed - St Louis County - August 21, 2017 - 08:28 AMM

100. As a direct and proximate result of the above-mentioned conduct, Dubuque has suffered severe mental, emotional and psychological distress and bodily harm, including but not limited to (a) being diagnosed with Post-Traumatic Stress Disorder (PTSD), fainting, weight loss, insomnia, depression, inability to cope with stress, isolation, reduced socialization, loss of trust, and feeling threatened; (b) incurring health care provider costs; and (c) continuing to incur health care provider expenses in the future in sums not presently ascertainable.

101. The above-mentioned distress is medically diagnosable and of sufficient severity so as to be medically significant.

102. Wedewer should have realized that his conduct involved unreasonable risk of causing distress to Dubuque.

103. As a direct and proximate result of the above-mentioned conduct, Dubuque has suffered damages in an amount exceeding $25,000.00.

Wherefore Dubuque prays that the Court enter judgment in his favor and against Wedewer on Count VI, award Dubuque damages in a fair and reasonable amount and exceeding $25,000.00, award pre- and post-judgment interest and costs, and grant any further and additional relief that the Court deems just and appropriate.

**COUNT VII Negligent Infliction of Emotional Distress**
**(against Boeing)**

104. Dubuque incorporates the allegations contained in paragraphs 1 through 103 as though fully stated herein.

105. At all times relevant herein, Burns and Wedewer were acting within the scope and course of their employment with and as agents of Boeing, and, as such,

Electronically Filed - St Louis County - August 21, 2017 - 08:28 AMM

Boeing is vicariously liable (respondeat superior liability) for Burns and Wedewer's conduct and jointly and severally liable with Burns and Wedewer.

106. Boeing controls and had a right to control the manner and means of Burns and Wedewer's conduct herein, Burns and Wedewer's conduct was done to serve the interests of Boeing, and Burns and Wedewer's actions were carried out on Boeing property.

107. Boeing has a legal duty to protect Dubuque from injury.

108. As a result of Boeing's respondeat superior liability and the Boeing Statement, Boeing breached the above-mentioned duty.

109. As a direct and proximate result of the above-mentioned conduct, Dubuque has suffered severe mental, emotional and psychological distress and bodily harm, including but not limited to (a) being diagnosed with Post-Traumatic Stress Disorder (PTSD), fainting, weight loss, insomnia, depression, inability to cope with stress, isolation, reduced socialization, loss of trust, and feeling threatened; (b) incurring health care provider costs; and (c) continuing to incur health care provider expenses in the future in sums not presently ascertainable.

110. The above-mentioned distress is medically diagnosable and of sufficient severity so as to be medically significant.

111. Boeing should have realized that its conduct involved unreasonable risk of causing distress to Dubuque.

112. As a direct and proximate result of the above-mentioned conduct, Dubuque has suffered damages in an amount exceeding $25,000.00.

Electronically Filed - St Louis County - August 21, 2017 - 08:28 AMM

Wherefore Dubuque prays that the Court enter judgment in his favor and against Boeing on Count VII, declare Boeing jointly and severally liable with Burns and Wedewer, award Dubuque damages in a fair and reasonable amount exceeding $25,000.00, award pre and post-judgment interest and costs, and grant any further and additional relief that the Court deems just and appropriate.

**CAPES, SOKOL, GOODMAN & SARACHAN, P.C.**

By: /s/ Drey A. Cooley
Drey A. Cooley, MBE #58784
Sanford J. Boxerman, MBE #37436
7701 Forsyth Blvd., 12th Floor
St. Louis, MO 63105
Telephone: (314) 721-7701
Facsimile: (314) 721-0554
cooley@capessokol.com
boxerman@capessokol.com