**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARK W. DUBUQUE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 4:17-CV-2401 CAS |
| v. | ) | |
| | ) | |
| THE BOEING COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This removed matter is before the Court on the motion of defendant The Boeing Company ("Boeing") to dismiss plaintiff's Petition for Wrongful Discharge (Public Policy Exception) ("Petition") pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Plaintiff opposes the motion and it is fully briefed. For the following reasons, the Court concludes it has subject matter jurisdiction over this matter and will therefore deny Boeing's Rule 12(b)(1) motion, but will grant its alternative Rule 12(b)(6) motion and dismiss the Petition for failure to state a claim upon relief can be granted.

**I. Background**

A. <u>Plaintiff's Employment and the AFOSI Investigation</u>

Plaintiff Mark W. Dubuque ("plaintiff") was employed by Boeing as an at-will employee until his termination on February 29, 2016. Prior to December 2013, plaintiff possessed active Special Action Program ("SAP") clearances and access for purposes of his highly classified work at Boeing.[1] Plaintiff alleges that in February 2013, Boeing acquired the Acalis microprocessor

---

[1]A SAP is defined by Executive Order 12958, § 4.1(h) (April 17, 1995) as "a program established for a specific class of classified information that imposes safeguarding and access requirements that exceed those normally required for information at the same classification level."

business on the recommendation of Chris Wedewer, a Boeing executive in Special Programs within the Global Strike division of Boeing Military Aircraft. Wedewer was the supervisor of plaintiff's supervisor, Chris Burns. Acalis became a division of Boeing and a press release described its microprocessors as containing "unique hardware and software that can guard mission-critical onboard systems in Boeing platforms."

Plaintiff alleges that Wedewer's reputation, performance goals, and executive compensation were dependent on the success and longevity of the Acalis microprocessor chips, revenue generated from the sale of the chips, and Boeing's ability to integrate Acalis into other Boeing projects. Some of plaintiff's unclassified job duties included working with commercial industries to mature anti-tamper technology and to recommend to Boeing anti-tamper solutions. In the scope of those duties, plaintiff on numerous occasions informed Wedewer and other employees at Boeing sites outside of St. Louis that a third party (the "Third Party") had a part that was cheaper, more flexible and reliable, and had better performance than Boeing's Acalis chips. Plaintiff alleges Wedewer and Burns immediately began treating him differently after he made these statements.

On November 21, 2013, Boeing requested that plaintiff meet with a customer on November 26, 2013. On November 26, 2013, plaintiff entered a room expecting to meet with a customer and instead found two agents from the Air Force Office of Special Investigations ("AFOSI"). The agents interrogated plaintiff for approximately six hours about his relationship with the Third Party and accused him of disclosing classified information and deleting documents from his computer. On the same date, the agents went to plaintiff's home to take and copy his work and personal computers.

On December 10, 2013, AFOSI agents returned to Boeing and conducted a lengthy polygraph examination of plaintiff. During the polygraph, plaintiff was asked, among other things, about his relationship with the Third Party, whether he had mishandled classified data, whether he

had deleted files from his computer, and whether he was trying to "sabotage" his program. At the conclusion of the polygraph, the agents accused plaintiff of lying to them and told him his SAP access and clearances were suspended. On December 20, 2013, AFOSI sent a Memorandum to Boeing officially notifying it of an ongoing AFOSI investigation involving plaintiff (the "AFOSI Memo"). The AFOSI Memo stated in pertinent part: "[Plaintiff's] access to all Special Access Programs (SAPs) information and areas under AFOSI security cognizance is removed. [Plaintiff] will remain in this status pending the completion and review of the AFOSI investigation. This action is temporary and not authorization to debrief [plaintiff]." Pet., Ex. A (Doc. 5).

The AFOSI investigation continued into 2014 or 2015. In the meantime, plaintiff performed non-SAP duties at Boeing and was given no information about the status of the investigation. Between December 2013 and January 2016, Boeing told plaintiff upon his inquiries that the AFOSI investigation was instigated as a result of issues raised by the United States Government, not by Boeing. In March 2015, plaintiff filed Freedom of Information Act ("FOIA") requests with AFOSI and the Department of the Air Force, seeking information and documents relating to his SAP clearance and the AFOSI investigation. In January 2016, plaintiff obtained the AFOSI investigation file and learned that it was Boeing, through Wedewer and Burns, that instigated the AFOSI investigation. Plaintiff learned Wedewer and Burns had made false statements to AFOSI that plaintiff had improper relationships with the Third Party, unlawfully disclosed classified information, and unlawfully deleted files from his computer. Plaintiff also learned that after extensive investigation, AFOSI found no evidence of wrongdoing by plaintiff. Only upon receiving the AFOSI file did plaintiff learn of the existence of the December 20, 2013 AFOSI Memo sent to Boeing.

B.  <u>SAP Programs Generally and the Debriefing Process</u>

According to the Petition, the genesis of the SAP program is Executive Order 12829 signed by President George H.W. Bush on January 6, 1993 ("1993 EO"), which expanded an earlier Executive Order No. 10865, signed by President Eisenhower on February 20, 1960 ("1960 EO").

The 1993 EO provides:

> This order establishes a National Industrial Security Program to safeguard Federal Government classified information that is released to contractors, licensees, and grantees of the United States Government. To promote our national interests, the United States Government issues contracts, licenses, and grants to nongovernment organizations. When these arrangements require access to classified information, the national security requires that this information be safeguarded in a manner equivalent to its protection within the executive branch of Government.

The 1993 EO and 1960 EO are implemented by specific Department of Defense ("DoD") Directives, Instructions and Operating Manuals, including, but not limited to:

a.  DoD Directive 5205.07, "Special Access Program (SAP) Policy," (July 1, 2010);

b.  DoD Instruction 5205.11, "Management, Administration, and Oversight of DoD Special Access Programs (SAPs)," (February 6, 2013);

c.  DoD Manual 5205.07, Volumes 1-4, DoD Special Access Program (SAP) Security Manual;

d.  DoD Instruction 5220.22, "National Industrial Security Program (NISP)," (March 18, 2011); and

e.  DoD 5220.22-M, "National Industrial Security Program Operating Manual," (February 28, 2006) as revised, amended, supplemented and changed thereafter, including its supplement DoD 5220.22-M-Sup-1.

Under the authority of DoD Instruction 5220.22, the Department of Defense promulgated DoD Manual 5220.22-M, entitled the National Industrial Security Program Operating Manual

("NISPOM"), a manual of specific rules and instructions governing the performance and operation of contracts dealing with classified national security information. The NISPOM, though still operative law, was supplemented by another DoD publication known as the NISPOM Supplement (DoD 5220.22-M-Sup-1). Pet. ¶¶ 13-16.

The NISPOM, NISPOM Supplement, and the SAP Security Manual (DoD Manual 5205.07) define "debriefings," and describe what they consist of, how they are performed, when they are performed and where they are to take place. The NISPOM Supplement defines a debriefing as "[t]he process of informing a person his need-to-know for access is terminated." NISPOM §3-108 states when debriefing can take place:

> Contractors shall debrief cleared employees at the time of termination of employment (discharge, resignation or retirement); when an employee's PCL [personal security clearance] is terminated, suspended or revoked; and upon termination of the FCL [Facility Security Clearance].

NISPOM Supplement §3-104 states who is to do the debriefing and what it shall consist of:

> **Debriefing and/or Access termination**. Persons briefed to SAP's will be debriefed by the CPSO [Contractor/Command Program Security Officer] or his designee. The debriefing will include as a minimum a reminder of each individual's responsibilities according to the NDA which states that the individual has no Program or Program-related material in his/her possession, and that he/she understands his/her responsibilities regarding the disclosure of classified Program information.

SAP debriefings are similarly defined by the DoD Manual 5205.07, SAP Security Manual, Vol. 2, Encl. 3, Sec. 13 (Nov 24, 2015).

The Petition alleges that the JAFAN 6/0 Manual, Special Access Program Security Manual, §3-102 (May 29, 2008), and DoD Manual 5205.07, SAP Security Manual, Vol. 2, Encl. 3, Sec. 13 (Nov 24, 2015), provide that at a debriefing, the debriefed individual is (a) reminded of his obligations not to disclose classified information; (b) reminded of the penalties for espionage; (c)

told where to report suspected Foreign Intelligence Service contacts; (d) told what he/she can and cannot discuss or place in resumes and applications for security clearances; (e) asked to verify the return of any and all SAP classified material; (f) given the ability to ask questions and receive substantive answers from the person providing the debriefing; and (g) reminded of his/her responsibilities under the SAPIA (Special Access Program Indoctrination Agreement).[2]

NISPOM Supplement §3-104 states where debriefings should take place: "Debriefings should be conducted in SAPF [Special Access Program Facility], Sensitive Compartmented Information Facility or other secure area where possible, or as authorized by the PSO [Program Security Officer]." JAFAN 6/0, §3-102 similarly states: "Debriefings will be conducted in a SAPF or other secure area when possible, as authorized by the PSO."

NISPOM §6-201.b and §6-201.c(2) address where classified information at various levels may be discussed, and the requirements for persons in attendance when classified information is discussed:

> **Location of meetings**. Classified sessions shall be held only at a Federal Government Installation or a cleared contractor facility where adequate physical and procedural controls have been approved. The authorizing government agency is responsible for evaluating and approving the location of the proposed meeting.

> **Clearance and Need-to-know**. All persons in attendance at classified sessions shall possess the requisite clearance and need to know for the information to be disclosed. Need-to-know shall be determined by the authorizing agency or its designee based on the justification provided. Attendance shall be authorized only to those persons whose security clearance and justification for attendance have been verified by the security officer of the organization represented. The names of all authorized attendees or participants must appear on an access list with entry permitted to the classified session only after verification of the attendees' identity based on

---

[2]The Petition does not quote any language from JAFAN 6/0 Manual, Special Access Program Security Manual, §3-102 (May 29, 2008), and DoD Manual 5205.07, SAP Security Manual, Vol. 2, Encl. 3, Sec. 13 (Nov 24, 2015), but instead offers what appears to be plaintiff's interpretation of or paraphrasing of that language.

presentation of official photographic identification such as a passport, contractor or U.S. Government identification card.

The DoD Special Access Program (SAP) Security Manual, DoD Manual 5205.07 Vol 3, Encl. 3, addresses who may enter a SAP Facility ("SAPF"): "When a SAPF... [is] operational, only appropriate accessed SAP indoctrinated individual(s) will occupy them." Pet. ¶¶ 51-60.

C. Boeing's Directive that Plaintiff Debrief, His Refusal, and Termination

Beginning in 2015, Boeing repeatedly directed that plaintiff be debriefed on his SAP programs and that the debriefing occur in a classified SAP room. Boeing sought to debrief plaintiff on the SAP for economic reasons. Boeing's Program Manager requested that plaintiff be debriefed because his suspension from SAP access had not been resolved, and the Program Manager needed the "program billet" for other personnel to support the Special Access Programs.[3] Until plaintiff was debriefed, the Program Manager could not submit anyone else to replace him on the SAP because the billet structure required a one-for-one swap of personnel in the program billet, and there were no exceptions to the customer policy. Even if a person was in suspended status, the suspended person's position was counted against the billet structure. Due to the uniqueness and minimal billets the Program Manager had on the Special Access Programs, he could not afford to have a currently non-contributing individual holding a billet.

Plaintiff, verbally and through communications from his counsel, repeatedly informed Boeing that it would be unlawful for him to be debriefed at that time and to enter a SAP room – although Boeing told him he could enter with an escort – because his SAP access was suspended. Pet., Ex. B at 1-2. Plaintiff himself informed Boeing that because his SAP access was suspended,

---

[3]In this context, the term "billet" means a specific personnel position which may be filled by one person. See Military Dictionary, Department of Defense (DOD), Joint Doctrine Division, http://www.military-dictionary.org/billet (last accessed Mar. 14, 2018).

he could not be debriefed at all, and could not enter a SAP classified room. Plaintiff also told Boeing that even if he could be debriefed, his SAP suspension precluded him from asking the questions and receiving the substantive answers he was authorized to ask for and receive under the SAP debriefing protocols and regulations. Plaintiff repeatedly told Boeing verbally and in writing that he would not debrief, because he refused to violate any laws or mandates of AFOSI by agreeing to be debriefed in a SAP classified room and while his SAP access was suspended.

Boeing told plaintiff that if he refused to debrief, it would take "corrective action" and report his refusal to the U.S. Government, which would negatively affect all of plaintiff's security clearances and prevent him from obtaining work in the future that required a security clearance. Plaintiff took two separate medical leaves from Boeing in the fall of 2015 due to distress over Boeing's treatment of him and the AFOSI investigation.

On February 20, 2016, before plaintiff returned to work after his second medical leave, he filed a lawsuit in state court seeking a declaratory judgment that Boeing had no right to debrief him, and that it would be illegal for Boeing to brief him in a SAP room while his SAP access was suspended, or to take adverse employment action against him for his refusal to debrief under those circumstances. Pet., Ex. C. Plaintiff returned to work on February 22, 2016 and Boeing immediately directed that plaintiff debrief while his SAP access was suspended and in a SAP room, or face adverse employment action if he refused. Boeing scheduled plaintiff's SAP program debriefing to take place in a SAP room on February 25, 2016 at 11:00 a.m.

On February 24, 2016 and the morning of February 25, 2016, plaintiff provided various Boeing managers and Corporate Governance with a copy of the state court lawsuit, but one of his supervisors, Jennifer Splaingard, insisted that he debrief and stated that if he did not, she would take action. Splaingard and a Human Resources ("HR") representative told plaintiff that if he did not

debrief as scheduled, he "may be administratively debriefed and the process would make [plaintiff] unemployable." Plaintiff asked for clarification that the U.S. Government would permit him to enter a SAP room while his SAP was suspended, but Splaingard and the HR representative refused to respond. On February 25, 2016, plaintiff sent an email to various Boeing managers memorializing his conversation with Splaingard and the HR representative, and stating that on the advice of counsel he would not participate in the debriefing scheduled for that morning. Pet., Ex. D.

In response to plaintiff's refusal to debrief, Boeing issued plaintiff an Employee Corrective Action Memo dated February 25, 2016 (the "Memo"), that stated in pertinent part, "It has been determined that you failed to comply with management direction on February 25, 2016. Specifically, you failed to comply with the security debriefing process for special program access. The company deems this unacceptable and it will not be tolerated. We will proceed with further corrective action if you do not comply with the security debriefing process by Monday, February 29, 2016." Pet., Ex. E. Both Boeing Management and plaintiff were to sign the Memo. Above plaintiff's signature on the memo, he wrote, "I will debrief as soon as it can be accomplished with legal certainty (US Govt Letter)." Boeing notified plaintiff he would be debriefed in a SAP room on February 29, 2016 at 9:00 a.m., and Splaingard sent him home on February 25, 2016 until February 29, 2016 without pay. Splaingard informed plaintiff that if he did not debrief on February 29, 2016, Boeing would start the termination process.

On February 29, 2016, plaintiff sent an email to Splaingard and other Boeing managers, reminding Boeing that plaintiff and his attorneys had repeatedly asserted he could not debrief from SAP programs while suspended. Plaintiff's email stated, among other things, that he knew "violating the suspended access is potentially criminal. As a result, I cannot debrief today." Pet., Ex. F. In response to plaintiff's refusal to debrief, he was summoned to Splaingard's office. A

Human Resources employee was also present. Splaingard informed plaintiff that he was terminated as an employee of Boeing.

Boeing issued plaintiff an Employee Corrective Action Memo dated February 29, 2016 that stated in pertinent part, "It has been determined that you failed to comply with management direction on February 29, 2016. Specifically, you failed to comply with the security debriefing process for special access programs. The company deems this unacceptable and it will not be tolerated . . . As a result of repeated violations for failing to comply with management direction, you are hereby discharged from the Boeing Company effective Monday, February 29, 2016." Pet., Ex. G. Above his required signature on this Memo, plaintiff wrote, "This is a request to perform a potentially criminal act." Below his signature, plaintiff wrote, "I cannot violate the agent (govt) direction related to SAP suspension. This has been relayed in many communications from Attorney to Attorney."

On March 8, 2016, Boeing reported to the Defense Security Service that plaintiff "was terminated for cause due to his failure to comply with management directions with security debriefing process for special program access." Boeing's report was logged in the Federal Government Joint Personnel Adjudication System.

D. <u>Plaintiff's Initiation of this Action</u>

Plaintiff's termination from employment rendered moot his lawsuit seeking a declaration that Boeing could not take adverse action against him for refusing to debrief, and he dismissed that action without prejudice. Plaintiff filed the instant Petition for Wrongful Discharge (Public Policy Exception) in state court on August 21, 2017. Boeing removed the case to this Court on September

12, 2017, on the basis of federal question jurisdiction, 28 U.S.C. § 1331; diversity of citizenship

jurisdiction, 28 U.S.C. § 1332;[4] and the federal officer removal statute, 28 U.S.C. § 1442(a)(1).

In the Petition, plaintiff asserts he had repeatedly informed Boeing, and reasonably believed,

that it would have been a serious violation of federal law, statutes, regulations, guidelines, rules,

directives, issuances, and manuals, and thus a violation of well established and clearly mandated and

defined public policy, for him to take any of the following actions:

 a. Debrief from his SAP program while his SAP access was suspended;

 b. Enter a SAP room while his SAP access was suspended; and

 c. Debrief from his SAP Program and enter a SAP room, after AFOSI expressly
 notified Boeing that it was not authorized to debrief [plaintiff] and that [plaintiff's]
 SAP access was suspended.

Pet. ¶ 101.a-.c. The Petition also alleges it would have been a serious violation of federal law,

statutes, regulations, guidelines, rules, directives, issuances, and manuals, and thus a violation of

well established and clearly mandated and defined public policy, for Boeing to debrief plaintiff

"while his SAP access was suspended, in a SAP room and while the AFOSI had expressly directed

Boeing not to debrief" him. Pet. ¶ 102.

Plaintiff's Petition cites numerous sources to support his allegations that the foregoing three

actions would be illegal: Sections of the NISPOM and NISPOM Supplement; of JAFAN 6/0; of

Executive Order 13526 (Dec. 19, 2009); of DoD Instruction 5205.11; of DoD Manual 5205.07, Vols.

1, 2, and 3; 18 U.S.C. § 793(d), (f), and (g); 18 U.S.C. § 371; Adjudicated Guidelines for

Determining Eligibility for Access to Classified Information, 32 C.F.R. Part 147, Subpart A,

---

 [4]Plaintiff is a citizen of Missouri and Boeing is a citizen of Illinois and Delaware. There is
no dispute that the amount in controversy exceeds $75,000.

§ 147.13; sections of Air Force Instruction 16-701; and the AFOSI Memo dated December 20, 2013. Pet. ¶¶ 102, 102.a.-102.k.

Plaintiff contends that he was discharged by Boeing because he engaged in the protected activity of refusing to engage in the three specified actions and thus violate the law and well established and clearly mandated public policy as set forth in the above-referenced federal law, statutes, regulations, guidelines, rules, directives, issuances, and manuals.  Plaintiff asserts that as a result of the discharge, he has suffered past and future lost income and compensation and benefits of employment, emotional and mental distress, and medical bills.  Plaintiff also seeks punitive damages.

## II.  Legal Standards

### A.  <u>Motion to Dismiss for Lack of Subject Matter Jurisdiction – Rule 12(b)(1)</u>

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the federal court's subject matter jurisdiction over the plaintiff's cause of action.  Fed. R. Civ. P. 12(b)(1). Without subject matter jurisdiction, district courts have no judicial power to do anything other than dismiss a case in its entirety.  <u>Arbaugh v. Y&H Corp.</u>, 546 U.S. 500, 514 (2006).  "Jurisdiction is power to declare the law, and without jurisdiction the court cannot proceed at all in any cause." <u>Ruhrgas AG v. Marathon Oil Co.</u>, 526 U.S. 574, 577 (1999) (quotation marks, brackets, and quoted case omitted).  "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  Fed. R. Civ. P. 12(h)(3).

The federal courts have subject matter jurisdiction under 28 U.S.C. § 1331 to hear "only those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law."  <u>Franchise Tax Bd. v. Const. Laborers Vacation Trust</u>, 463 U.S. 1, 27-28

(1983).  A complaint presents a question of federal law when the right to recovery under the complaint "will be supported if the Constitution or laws of the United States are given one construction or effect, and defeated if they receive another."  Gully v. First Nat'l Bank, 299 U.S. 109, 112 (1936).

"In order to properly dismiss [an action] for lack of subject matter jurisdiction under Rule 12(b)(1), the complaint must be successfully challenged on its face or on the factual truthfulness of its averments." Titus v. Sullivan, 4 F.3d 590, 593 (8th Cir. 1993) (citing Osborn v. United States, 918 F.2d 724, 729 n.6 (8th Cir. 1990)).  Distinguishing between a facial and factual challenge is critical to determining how a court should proceed when resolving a motion to dismiss for lack of subject matter jurisdiction.  Under a facial challenge to jurisdiction, a court restricts itself to the face of the pleadings, Osborn, 918 F.2d at 729, n.6, and all of the factual allegations concerning jurisdiction in the plaintiff's complaint are presumed to be true, while under a factual challenge no presumptive truthfulness attaches.  See Titus, 4 F.3d at 593 & n.1.  The motion asserting a facial challenge will be successful if the plaintiff fails to allege an element necessary for subject matter jurisdiction. Id.

Here, Boeing makes a facial challenge to plaintiff's Petition.  Therefore, all factual allegations are accepted as true and all reasonable inferences are made in favor of the plaintiff.  Carlsen v. GameStop, Inc., 833 F.3d 903, 908 (8th Cir. 2016).  It is appropriate for the Court to consider the face of the Petition as well as "other materials necessarily embraced by the pleadings[.]" Kuhns v. Scottrade, Inc., 868 F.3d 711, 715 (8th Cir. 2017).

B.  Motion to Dismiss for Failure to State a Claim – Rule 12(b)(6)

The purpose of a motion to dismiss for failure to state a claim is to test the legal sufficiency of the complaint.  To survive a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a

claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim for relief "must include sufficient factual information to provide the 'grounds' on which the claim rests, and to raise a right to relief above a speculative level." Schaaf v. Residential Funding Corp., 517 F.3d 544, 549 (8th Cir. 2008) (citing Twombly, 550 U.S. at 555 & n.3). This obligation requires a plaintiff to plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555.

On a motion to dismiss, the Court accepts as true all of the factual allegations contained in the complaint, even if it appears that "actual proof of those facts is improbable," id. at 556, and reviews the complaint to determine whether its allegations show that the pleader is entitled to relief. Id. at 555-56; Fed. R. Civ. P. 8(a)(2). The principle that a court must accept as true all of the allegations contained in a complaint does not apply to legal conclusions, however. Iqbal, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice").

"While courts primarily consider the allegations in the complaint in determining whether to grant a Rule 12(b)(6) motion, courts additionally consider 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned;' without converting the motion into one for summary judgment." Miller v. Redwood Toxicology Lab, Inc., 688 F.3d 928, 931 & n.3 (8th Cir. 2012) (quoting 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2004)). There are multiple exhibits attached to plaintiff's Petition, which the Court considers on this motion.

## III.  Discussion

### A.  Rule 12(b)(1) – Plaintiff's Petition is Not Nonjusticiable

Boeing moves to dismiss plaintiff's Petition for lack of subject matter jurisdiction, asserting that it raises non-justiciable political questions which would require the Court to intrude on the Executive Branch's exclusive function of controlling access to highly sensitive national security information.  Specifically, Boeing argues that before the Court could examine plaintiff's wrongful discharge claim, the Petition's allegations would require it –

> to evaluate the legality and propriety of the debriefing procedures Boeing sought to enforce, to probe Boeing's basis for debriefing [plaintiff] from a highly classified SAP program despite [plaintiff's] multi-year suspension under the cloud of an Air Force investigation, and to weigh on the remedial actions necessitated when a cleared employee refuses directives from a cognizant security officer on a classified program.

Mem. Supp. Mot. Dismiss at 2 (Doc. 18).

Boeing asserts that courts have universally concluded they lack the authority to weigh decisions involving individual security clearances and classified program access because these involve a "political question."  Baker v. Carr, 369 U.S. 186, 217 (1962).  Boeing contends that under Department of the Navy v. Egan, 484 U.S. 518 (1998), and its progeny, no one has a "right" to a security clearance, the U. S. Constitution vests exclusive authority in the President to classify and control access to information bearing on national security, and unless Congress has specifically provided otherwise, courts have been reluctant to intrude upon the Executive Branch's authority in national security matters.  Boeing state that courts have held they are generally without subject matter jurisdiction to review an agency's security clearance decision, Hegab v. Long, 716 F.3d 790, 794 (4th Cir. 2013), and the merits underlying an interim action such as an investigation or

suspension are shielded from judicial scrutiny to the same degree as the decision to deny or revoke a security clearance.

Boeing asserts that the analysis is similar in cases involving a Government contractor, because the Executive Branch's constitutional authority to control access to classified information is delegated to its contractors and should not be subject to judicial review simply because a contractor exercises the authority, citing Beattie v. Boeing Co., 43 F.3d 559, 566 (10th Cir. 1994). Boeing argues this principle has even more force in the instant case, as its security clearance decisions were exercised as a logical and necessary extension of the Government's decision to initiate a multi-year investigation of plaintiff, to suspend plaintiff's SAP clearance, and not to reinstate it. Boeing asserts that whether a person is debriefed from a SAP program by a federal contractor or by the Government, all SAP debriefings, however conducted, "implicate the quintessential exercise of the President's Article II discretionary authority, as implemented by certain Executive Agencies tasked with administering the National Industry Security Program, and as delegated to defense and intelligence contractors who execute that Program." (Doc. 18 at 10.) Boeing concludes that based on this authority, the issues presented by the Petition are nonjusticiable.

Plaintiff responds that Boeing's subject matter jurisdiction argument sets up and attacks a straw man, as it wrongfully characterizes his suit as an attack on the merits of a security clearance decision. Plaintiff states he does not ask the Court to review the AFOSI's discretionary decision to suspend his SAP access, or to weigh in on the validity of Boeing's desire to debrief him. Rather, plaintiff asserts that his suit is a state law tort claim for wrongful termination of employment by a private company due to plaintiff's refusal to violate federal law by consenting to debrief in a SAP Facility, while suspended from SAP clearance, after AFOSI directed Boeing not to debrief him.

Plaintiff contends that the Supreme Court's <u>Egan</u> decision does not control here because it applies to the narrow issue of judicial review of the substance of a decision to deny or revoke a security clearance. Plaintiff argues the cases Boeing cites are exclusively limited to requests that courts second-guess the merits of the inherently discretionary judgments to deny, suspend, or revoke a security clearance. Plaintiff asserts that courts routinely review issues related to security clearances and national security when they are not asked to second-guess the merits of a security clearance decision. Plaintiff cites, among other cases, <u>Sanchez v. U.S. Department of Energy</u>, 870 F.3d 1185, 1195-96 (10th Cir. 2017), <u>Zeinali v. Raytheon Co.</u>, 636 F.3d 544, 550 (9th Cir. 2011), <u>Duane v. U.S. Department of Defense</u>, 275 F.3d 988, 993 (10th Cir. 2002), and <u>Stehney v. Perry</u>, 101 F.3d 925, 932 (3d Cir. 1996).

To determine whether subject matter jurisdiction exists in this matter, the Court must examine these cases in some detail. It is firmly established that courts do not have subject matter jurisdiction to review the merits of security clearance decisions because of the discretionary nature of such decisions, and because of the Executive Branch's exclusive authority over matters involving national security. In <u>Egan</u>, 484 U.S. 518, the Supreme Court held that the U.S. Navy's decision to deny a security clearance to an employee was not subject to review by the Merit Systems Protection Board (the "MSPB"). Acknowledging the Executive Branch's inherent authority to control national security-related matters, the Government's "'compelling interest' in withholding national security information from unauthorized persons," and the "obvious" fact that "no one has a 'right' to a security clearance," <u>id.</u> at 528, the Supreme Court concluded discretionary matters regarding security clearances are decisions of a type that "must be made by those with the necessary expertise in protecting classified information," and are entitled to deference from "outside nonexpert bod[ies]" such as the MSPB. <u>Id.</u> at 529. The Court observed that "unless Congress specifically has provided

otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs."  484 U.S. at 530.

Although Egan held only that a non-expert agency (the MSPB) lacked authority to review the merits of a security clearance decision, the circuit courts of appeals have uniformly extended its holding and held that Egan also forbids judicial review of the merits of clearance decisions.  See, e.g., Makky v. Chertoff, 541 F.3d 205, 212 (3d Cir. 2008) (citing Egan, stating "there is no judicial review of the merits of a security clearance decision"); Stehney, 101 F.3d at 932 (noting wide consensus in the Courts of Appeals about Egan's scope); Perez v. Federal Bureau of Investigation, 71 F.3d 513, 514-15 (5th Cir. 1995); Dorfmont v. Brown, 913 F.2d 1399, 1401 (9th Cir. 1990); Jamil v. Secretary of the Dep't of Defense, 910 F.2d 1203, 1206 (4th Cir. 1990); Hill v. Department of the Air Force, 844 F.2d 1407, 1409 (10th Cir. 1988).[5]

It is clear based on the foregoing authority that this Court would have no jurisdiction to review the decision to suspend plaintiff's SAP access on its merits.  "But not all claims arising from security clearance revocations violate separation of powers or involve political questions." Stehney, 101 F.3d at 932.  "Since Egan, the Supreme Court and several courts of appeals have held the federal courts have jurisdiction to review constitutional claims arising from the clearance revocation process." Id. (citing cases).  Courts have also held Egan does not preclude judicial review of a claim that a federal agency violated its own regulations and procedures when revoking or denying a security clearance, and courts may compel an agency to follow its own regulations.  See Stehney, 101 F.3d at 932 (citing cases; concluding plaintiff presented a justiciable claim where she sought review of whether the National Security Agency complied with its own regulations or violated her

---

[5]It does not appear the Eighth Circuit has had an opportunity to apply Egan in the context of judicial review of security clearance decisions.

18

constitutional rights in revoking her security clearance); Sanchez, 870 F.3d at 1194-96 (district court erred in dismissing Rehabilitation Act claim under Egan to the extent claim was based on Department of Energy's failure to engage in interactive process and to reassign plaintiff to a job that did not require a Human Reliability Program certification after plaintiff lost certification); El-Gayani v. U.S. Department of Energy, 591 F.3d 176, 186-91 (3d Cir. 2010) (reviewing under Administrative Procedure Act plaintiff's claim that revocation of his security clearance violated relevant Department of Energy regulations; noting "there is no dispute as to the court's jurisdiction over [these] allegations"); Duane, 275 F.3d at 993 (jurisdiction existed to review issues as to (1) whether Department of Defense followed its own regulations by permitting revocation of plaintiff's security clearance on the grounds used by the administrative judge, and (2) whether plaintiff was prejudiced by any failure to follow those regulations); Edwards v. Widnall, 17 F.Supp.2d 1038, 1042 (D. Minn. 1998) (no subject matter jurisdiction existed over claim that Department of the Air Force retaliated against plaintiff by changing the terms and condition of his employment, as this would require review of the merits of the decision to revoke his security clearance; but jurisdiction did exist over claim that Air Force retaliated against plaintiff by making false and defamatory statements).

Most relevant to the context of this case, courts have held that Egan does not preclude them from reviewing employment discrimination claims brought against private employers who are not responsible for the Executive's security clearance decision, where the motivation behind the security clearance decision is not questioned. In Zeinali v. Raytheon Co., 636 F.3d 544 (9th Cir. 2011), for example, an Iranian employee brought an action against his employer, Raytheon, alleging it violated the California Fair Employment and Housing Act by terminating him on the basis of his race and national origin after he was denied a security clearance by the Department of Defense. Raytheon contended the court lacked jurisdiction over Zeinali's discrimination claim because of the principle

announced in <u>Egan</u> and a subsequent Ninth Circuit decision, <u>Brazil</u>, which held that federal courts

may not "review . . . security clearance decisions made by the Executive or his delegee . . . in the

context of a Title VII discrimination action." <u>Brazil v. U.S. Dep't of the Navy</u>, 66 F.3d 193, 196

(9th Cir. 1995).

The Ninth Circuit rejected Raytheon's argument, concluding that such a broad reading of

<u>Egan</u> and <u>Brazil</u> was inappropriate because "[i]n employment discrimination suits against private

employers, courts can generally avoid examining the merits of the government's security clearance

decision" while evaluating the allegedly discriminatory conduct. <u>Zeinali</u>, 636 F.3d at 551. The

Court explained its reasoning as follows:

> The fundamental logic of <u>Brazil</u> is that in an employment discrimination
> claim *against the agency that made* the security clearance decision, the second and
> third steps of the <u>McDonnell Douglas</u> framework necessarily require an inquiry into
> the defendant's proffered reasons for the adverse employment decision. <u>Id.</u> at 197.
> Raytheon's proposed approach is particularly inappropriate in cases brought against
> private employers, because such defendants are rarely responsible for (or even
> substantially involved in) the government's security clearance decisions. But if the
> plaintiff sues a defendant for allegedly discriminatory conduct that is merely
> connected to the government's security clearance decision, the concerns of <u>Egan</u> are
> not necessarily implicated. We are therefore persuaded by the reasoning of the Third
> Circuit that federal courts have jurisdiction to decide claims that "do[] not
> necessarily require consideration of the merits of a security clearance decision," as
> long as they remain vigilant not to "question the motivation behind the decision to
> deny [the plaintiff's] security clearance." <u>Makky v. Chertoff</u>, 541 F.3d 205, 213 (3d
> Cir. 2008)

<u>Zeinali</u>, 636 F.3d at 550 (footnote omitted).[6] <u>See</u> <u>also</u> <u>Makky</u>, 541 F.3d at 213 (concluding subject

matter jurisdiction existed over Title VII mixed-motive discrimination claim by employee who

alleged he was suspended without pay because of his national origin and religion, even though

---

[6]The Ninth Circuit listed in a footnote six post-<u>Egan</u> cases "in which district courts exercised jurisdiction over employment discrimination claims involving plaintiffs who were terminated on account of their federal security clearance status." <u>Zeinali</u>, 636 F.3d at 551 n.7 (citing, among other decisions, <u>McDaniel v. AlliedSignal, Inc.</u>, 896 F. Supp. 1482, 1491 (E.D. Mo. 1995)).

proceedings concerning the employee's security clearance had begun at the time; review of the Title VII claim's merits did not necessarily require consideration of the merits of the security clearance decision); Strong v. Orkand Corp., 83 F. App'x 751 (6th Cir. 2003) (exercising jurisdiction over plaintiff's Title VII claim asserting race discrimination against a private employer following denial of a security clearance by the U.S. Postal Inspection Service); Blankenship v. Martin Marietta Energy Sys. Inc., 83 F.3d 153 (6th Cir. 1996) (exercising jurisdiction over plaintiff's state law handicap discrimination claim against private employer who suspended her after the Department of Energy suspended and then revoked her security clearance); Johnson v. Southwest Research Inst., 210 F.Supp.3d 863, 868-69 (W.D. Tex. 2016) (denying motion to dismiss Title VII retaliation claim for lack of subject matter jurisdiction under Egan where plaintiff alleged her termination was based on reasons other than the termination of her access to classified information, and that any denial of access to classified documents was the result of her discharge); Muir v. Applied Integrated Techs., Inc., 2013 WL 6200178, at *6-8 (D. Md. Nov. 26, 2013) (denying motion to dismiss Title VII and state law fair employment practices sex discrimination claims for lack of subject matter jurisdiction under Egan: "Plaintiff's theory of the case does not require the court to evaluate the propriety of the security clearance determination or investigation because, according to Plaintiff, her termination was not based on a security clearance determination.").

In the instant case, plaintiff's Petition does not challenge the merits or the circumstances of AFOSI's decision to suspend his SAP access. Plaintiff's sole claim is that Boeing wrongfully discharged him in contravention of Missouri public policy because he refused to violate SAP-related federal laws and regulations, and thus would not submit to Boeing's illegal demand that he debrief from the SAP program, in a SAP Facility, while his SAP access was suspended, and while Boeing was under AFOSI direction not to debrief him. As pleaded, plaintiff's state law claim is "merely

connected to the government's security clearance decision," and as a result "the concerns of Egan are not necessarily implicated." Zeinali, 636 F.3d at 550. This Court need not evaluate the merits or motivations behind the AFOSI decision to suspend plaintiff's SAP access in order to determine whether Boeing wrongfully terminated plaintiff's employment in violation of public policy for his refusal to violate federal laws and regulations. Plaintiff's Petition therefore does not present a nonjusticiable political question.

Accordingly, the Court concludes that it has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1),[7] and the principles established by Egan and its progeny do not preclude it from reviewing plaintiff's state law wrongful discharge claim. Boeing's motion for dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) will be denied.

B. Rule 12(b)(6) – Plaintiff Fails to State a Claim of Wrongful Discharge in Violation of Public Policy

1. *The Parties' Arguments*

In the alternative, Boeing asserts that even if the Petition raises justiciable issues, plaintiff does not allege facts that could give rise to a valid claim for wrongful discharge under Missouri's public policy exception. Boeing states that Government contractors enjoy broad discretion over which employees will be sponsored for access to classified programs, and access to SAP information is neither a right nor an entitlement. As a result, it contends, there is no public policy supporting plaintiff's alleged efforts to indefinitely delay or avoid being debriefed from a SAP program.

Boeing argues that plaintiff's claim it would have been unlawful for him to enter a SAP Facility to be debriefed is facially inconsistent with the security guidelines cited in the

---

[7]Because the Court has subject matter jurisdiction over this case based on complete diversity of citizenship, it is not necessary to address whether subject matter jurisdiction also exists based on federal question jurisdiction or federal officer removal.

Petition—which clearly authorize *escorted* access to a SAP Facility by individuals who do not have an active SAP clearance—so nothing in Boeing's instruction to debrief plaintiff would have required him to violate any law or public policy. Boeing also asserts that none of the documents cited in the Petition support plaintiff's argument that it would be unlawful for Boeing to debrief him in a SAP Facility. Boeing states that the JAFAN Manual includes procedures allowing non-cleared personnel, such as plaintiff, to access SAP Facilities with an appropriate escort, citing JAFAN Manual §§ 6-101(f) ("Visit Request Procedures") and 6-102 ("Non-Program-Briefed Visitor Record"); DoD Manual at 11 (requiring procedures to identify and control visitors to SAP Facilities). Thus, Boeing contends it would not be "unlawful" to escort plaintiff into a cleared facility for his debriefing, as it had proposed, citing JAFAN Manual § 6-101(f) (providing for escorting of non-cleared visitors into a SAPF), and Petition Exhibit B at 1 (acknowledging that Boeing offered to provide plaintiff with an escort to enter the SAPF).

Second, Boeing argues that while there is a preference for providing answers to relevant questions during a debriefing, there is no such requirement. Boeing states that where it proves "difficult" to obtain in-person participation for a debriefing, both the JAFAN and DoD Manuals permit "administrative debriefings" in which there is no opportunity to ask questions, citing JAFAN Manual at 30; DoD Manual at 15. Boeing argues that plaintiff mischaracterizes the AFOSI Memo when he alleges that "Boeing was <u>not</u> authorized to debrief [plaintiff]." Pet. ¶ 50. Boeing asserts the AFOSI Memo stated only that the Memo itself was "not authorization to debrief" plaintiff, and did not prohibit Boeing from debriefing plaintiff two years later.

Finally, Boeing argues that the practices and protocols for access to highly classified SAP programs that plaintiff relies on do not give rise to any public policy mandate applicable to the population at large in Missouri. Instead, Boeing states that they apply to a unique and limited class

of sensitive Government programs, and the Government and contractor personnel who possess a unique need-to-know and are deemed to be eligible for access to those programs. Boeing states that the process is, by its very definition, "wholly discretionary" and open only to "those individuals who meet stringent background and security standards along with a valid need-to-know," quoting JAFAN Manual § 2-200. Consequently, Boeing argues that these procedures and its decision to terminate the employment of an at-will employee who failed to comply with repeated security and management instructions to participate in a SAP debriefing cannot form the basis for a wrongful discharge claim under the public policy exception.

Plaintiff responds that the Petition cites twenty-one provisions of federal law to support his allegation that debriefing under the circumstances—while his SAP access was suspended, in a SAP room, after AFOSI directed Boeing in writing not to debrief plaintiff—would violate federal law. Plaintiff's opposition memorandum does not identify any specific legal provision among the twenty-one provisions listed in his Petition, or cite to the particular language of any of the provisions, to support his allegations. Plaintiff rejects Boeing's argument that he wanted to remain briefed indefinitely, and states that the Petition makes clear he had no desire to remain "indefinitely" briefed, but rather only refused to be unlawfully debriefed.[8]

Plaintiff states that JAFAN §6-101(f), cited by Boeing, is inapplicable as it provides that one must "[c]ontinuously escort and closely control movement of non-program accessed visitors *requiring access* to a SAPF," but does not indicate that plaintiff was authorized to enter a SAPF. Plaintiff contends this provision merely insinuates that SAP rooms can have "visitors." Plaintiff also states that JAFAN §6-101(f) is inapplicable because he was not "requiring" or needing access to the

---

[8]Plaintiff does not suggest how he might have been "lawfully" debriefed.

SAP room—plaintiff states he did not want access while suspended—nor would he have constituted a "visitor" under the JAFAN.[9]  According to plaintiff, there are two types of visitors under JAFAN's Section 6:  Non-Program Briefed Visitors (§6-102) and Program Briefed Visitors (§6-103), and because he was briefed but suspended, he did not fit within either of these categories.  Plaintiff also states that the DoD Manual similarly does not authorize him to enter a SAP Facility as a visitor while suspended, because Volume 3 makes clear that only "appropriate accessed SAP indoctrinated individual(s) will occupy" operational SAP facilities, citing DoD Manual 5205.07, Volume 3, Enclosure 3, § 1(e) (April 23, 2015) and he was not "appropriately accessed" while suspended, and was not "seeking physical access" to the SAP while suspended.  Pet. ¶102.h.

Plaintiff further responds that even if these provisions imply that a person whose SAP access was suspended could enter a SAP as a "visitor," they still do not authorize that person to debrief there, especially while AFOSI has forbidden it.  Plaintiff asserts that all of the citations in his Petition make clear this is unlawful.  For example, plaintiff states that the law requires he have been able to see and discuss highly classified information and ask questions and receive substantive answers about the SAP during the type of debriefing Boeing demanded, but he could not have done so while suspended.[10]  Plaintiff states that Boeing fallaciously argues there is only a *preference* for

---

[9]The portion of plaintiff's brief containing this argument, beginning at the bottom of page 13 of his Memorandum in Opposition and continuing on page 14, is confusing because plaintiff repeatedly uses the term "Defendant" when the context indicates he intends to refer to himself.  For example, the brief states:  "Defendant solely argues that §6-102 permitted Plaintiff to enter a SAP. However, Defendant [sic] does not qualify as 'Non-Program Briefed.'  He was briefed on the SAP–that is why Defendant wanted to debrief him."  (Doc. 23 at 14.)

[10]In support of this statement, plaintiff cites Paragraph 102 of the Petition, which lists in subparagraphs approximately seventeen regulations, policy manuals, executive orders, DoD instructions and manuals, statutes, and the AFOSI Memo.  Plaintiff does not identify which of these authorities supports his claim.

providing answers to relevant questions during a debriefing, because the JAFAN and DoD Manuals permit administrative debriefings "[w]here is proves difficult to obtain in-person participation." Plaintiff states that Boeing's argument is incorrect but also misses the point, because plaintiff was not ordered to administratively debrief. Instead, the Petition alleges plaintiff was unlawfully ordered to debrief in person, in a SAP room, and during this type of debriefing the "law demands that [he] be able to, among other things, ask and receive answers to protected SAP information." Pl.'s Mem. Opp. at 15.

Boeing replies that the crux of plaintiff's claim for wrongful termination is that Boeing's instruction to attend and participate in the debriefing in a SAPF would have required plaintiff to violate federal law, because plaintiff did not believe he was permitted to enter a SAPF or participate in the debriefing while his SAP access privileges were suspended. Boeing asserts that this argument suffers from circular logic: Plaintiff would be permitted to remain indefinitely briefed to a highly classified SAP program, so long as his access privileges to that program remained suspended.

Boeing contends that nowhere in the Petition does plaintiff ever establish that the challenged security instructions would have required him to violate the law. Boeing states that while plaintiff repeatedly asserts he was not permitted to physically enter the SAPF because his clearance was suspended, he cites no statute, regulation, or other guidance to establish the "federal law" he claims the instruction would have forced him to violate. Boeing argues that plaintiff's physical presence in the SAPF, with a cleared escort provided by Boeing, was expressly permitted under security manuals referenced in the Petition, citing JAFAN Manual §§ 6-101(f) ("Visit Request Procedures") and 6-102 ("Non-Program-Briefed Visitor Record"); DOD Manual at 11 (requiring procedures to identify and control visitors to SAPFs). Boeing asserts that because it was permitted to escort plaintiff into the SAPF, regardless of whether his program clearance was suspended, there would

be no violation of "federal law" by conducting the debriefing in the SAPF. Boeing contends that plaintiff fails to meaningfully respond to this argument, which exposes a critical flaw in his claim, and instead raises the facially baseless argument that he did not qualify as an escorted "visitor" under the referenced guidelines because he "did not want access while suspended," and therefore he "was not 'requiring' or needing access to the SAP room." Pl.s' Mem. Opp. at 14. Boeing characterizes this response as "nothing but a game of semantics and more circular logic that would allow a suspended employee to indefinitely prolong his program access by refusing to participate in the debriefing process, simply because he did not 'want' to." Reply at 4. Boeing states that the controlling security guidance is clear that visitors—whether cleared to a program or not—are permitted to access a SAPF when accompanied by an escort, and the Petition alleges that Boeing's debriefing instruction was consistent with this guidance.

Boeing also replies that plaintiff's contention the debriefing instruction was improper because it required plaintiff and/or Boeing to "discuss highly classified information," such that the mere act of conducting the debriefing would violate federal law because it would have required plaintiff to discuss classified information, is based on a flawed characterization of the SAP debriefing procedures outlined in the DoD SAP Security Manual, 5205.08, Vol. 2, referenced in the Petition. Pet. ¶ 102.g. Boeing asserts that these procedures, in paragraph 13.a, require contractor program security officers (CPSOs) to "implement a formal debriefing program when access to SAP information is no longer required." While paragraph 13.b states that the debriefing procedures "will be arranged to allow each individual the opportunity to ask questions and receive substantive answers from the individual providing the debriefing," the guidance clarifies in paragraph 13.e that these include "at a minimum" only questions about information that can be used on a resume, or "questions about the [special access program indoctrination agreement]."

In other words, Boeing asserts that the debriefing process does not contemplate—let alone require—a sweeping discussion of classified program information to which plaintiff contends he was entitled. Instead, all of the "minimum" debriefing requirements outlined in paragraph 13.e relate to information that the debriefing party (here, Boeing) must furnish to the debriefed employee about the nature and scope of the employee's ongoing non-disclosure obligations, such as the penalties for violating the non-disclosure obligations, and an acknowledgment that any future questions or concerns regarding the SAP must be directed to a security officer. Boeing asserts there is no requirement in the outlined procedures, as plaintiff contends, for a debriefed employee to "ask and receive answers to protected SAP information." Mem. Opp. at 15. Boeing states that further confirmation it had no obligation to discuss classified SAP information in plaintiff's debriefing is the fact that individuals may receive "administrative debriefings" in which there is no opportunity to ask questions about the debriefing, citing DOD Manual 5205.08, Vol. 2, ¶ 14. To the extent plaintiff contends the regulations absolutely entitle him to discuss or access SAP information, Boeing replies that such an interpretation is plainly inconsistent with the long-settled precedent that no one has a right to a security clearance or classified information, citing Egan, 484 U.S. at 528.

As to plaintiff's argument that Boeing lacked authority to conduct the debriefing at all because the AFOSI Memo forbade it from debriefing him, Boeing asserts the Memo does not support plaintiff's claim for wrongful termination under the public policy exception for three reasons. First, Boeing asserts that a contractor does not require Government approval or authority to debrief an employee from a SAP, and plaintiff has pointed to no such requirement in the guidance cited throughout the Petition. Second, Boeing asserts no reasonable inference can be drawn from the AFOSI Memo of December 2013 that it was "forbidden" to debrief plaintiff more than two years later in February 2016. According to the Petition, the Air Force completed its investigation by 2015

28

and found no evidence of wrongdoing on plaintiff's part, see Petition ¶¶ 44, 48, but plaintiff's SAP access privileges remained suspended. Boeing states that whatever guidance the Air Force furnished in December 2013 about the "temporary" nature of the investigation and plaintiff's suspension, it no longer applied two years later when, by plaintiff's own allegation, the investigation was complete. Third, Boeing asserts that even assuming for purposes of argument that it needed Air Force approval to debrief plaintiff, Boeing's purported lack of approval would not cause plaintiff to violate any federal law or well-established public policy by complying with Boeing's instruction to debrief, as any procedural error would be Boeing's problem, not plaintiff's.

     2. *Analysis of Plaintiff's Petition Under Missouri's Wrongful Discharge Doctrine*

     Plaintiff was an at-will employee of Boeing. Generally, under Missouri law, "at-will employees may be terminated for any reason or for no reason." Fleshner v. Pepose Vision Inst., P.C., 304 S.W.3d 81, 91 (Mo. 2010) (en banc) (cited case omitted). "As a matter of law, [a] discharged at-will employee has no cause of action for wrongful discharge." Id. Missouri recognizes a "very narrowly drawn" public policy exception to the at-will employment rule, also known as the wrongful discharge doctrine. Margiotta v. Christian Hosp. Ne. Nw., 315 S.W.3d 342, 346 (Mo. 2010) (en banc). Under this doctrine, "An at-will employee may not be terminated (1) for refusing to violate the law or any well-established and clear mandate of public policy as expressed in the constitution, statutes, regulations promulgated pursuant to statute, or rules created by a governing body or (2) for reporting wrongdoing or violations of law to superiors or public authorities." Newsome v. Kansas City, Mo. Sch. Dist., 520 S.W.3d 769, 777 (Mo. 2017) (en banc) (quoting Fleshner, 304 S.W.3d at 92). Thus, Missouri law recognizes two distinct categories of protected activity: refusal to violate public policy, and reporting violations of public policy. Id. The first category is at issue in this case.

A wrongful discharge claim fails as a matter of law unless it is based on "explicit authority" such as a "constitutional provision, a statute, a regulation based on a statute or a rule promulgated by a governmental body." Frevert v. Ford Motor Co., 614 F.3d 466, 471 (8th Cir. 2010) (quoting Margiotta, 315 S.W.3d at 346). In a wrongful discharge case "the petition must specify the legal provision violated by the employer, and it must affirmatively appear from the face of the petition that the legal provision in question involves a clear mandate of public policy." Id. (internal quotation marks and quoted case omitted). A wrongful discharge plaintiff must show "*serious* misconduct that constitutes a violation of the law and of *well established* and *clearly mandated* public policy." Id. (quoting Margiotta, 315 S.W.3d at 347). The pertinent inquiry is whether the cited authority "clearly prohibits the conduct at issue in the action." Margiotta, 315 S.W.3d at 347.

Further, "not every statute or regulation gives rise to an at-will wrongful termination action." Margiotta, 315 S.W.3d at 346. "A vague or general statute, regulation, or rule cannot be successfully pled under the at-will wrongful termination theory, because it would force the court to decide on its own what public policy requires." Id. "Public policy is not to be determined by 'the varying personal opinions and whims of judges or courts . . . as to what they themselves believe to be the demands or interests of the public.'" Fleshner, 304 S.W.3d at 96 (quoted case omitted).

Missouri precedent is clear that "[w]hether a plaintiff reasonably believes an act violates public policy is irrelevant to a wrongful discharge claim." Newsome, 520 S.W.3d at 779 (citing Margiotta, 315 S.W.3d at 348). It is essential to the claim that the act the plaintiff refused to do would have actually violated public policy. Yerra v. Mercy Clinic Springfield Cmtys., 536 S.W.3d 348, 351 (Mo. Ct. App. 2017) (citing Newsome, 520 S.W.3d at 779).

Thus, to survive the motion to dismiss, the Petition must affirmatively show on its face that the misconduct plaintiff alleges "*serious* misconduct that constitutes a violation of the law and of

*well established* and *clearly mandated* public policy." <u>Frevert,</u> 614 F.3d at 471. Plaintiff's cited authority must "clearly prohibit[] the conduct at issue in the action," <u>Margiotta</u>, 315 S.W.3d at 347, or he will fail to state a claim upon which relief can be granted. <u>Id.</u>

As stated above, the Petition alleges it would have been a serious violation of federal law, statutes, regulations, guidelines, rules, directives, issuances, and manuals, and thus a violation of well established and clearly mandated and defined public policy, for plaintiff to take any of the following actions:

> a. Debrief from his SAP program while his SAP access was suspended;
>
> b. Enter a SAP room while his SAP access was suspended; and
>
> c. Debrief from his SAP Program and enter a SAP room, after AFOSI expressly notified Boeing that it was not authorized to debrief [plaintiff] and that [plaintiff's] SAP access was suspended.

Pet. ¶ 101.a-.c. The Petition alleges it would similarly have been a serious violation of federal law, statutes, regulations, guidelines, rules, directives, issuances, and manuals, and thus a violation of well established and clearly mandated and defined public policy, for Boeing to debrief plaintiff "while his SAP access was suspended, in a SAP room and while the AFOSI had expressly directed Boeing not to debrief" him. Pet. ¶ 102.

The Court must examine the Petition to determine whether it affirmatively shows on its face that plaintiff's cited authority "clearly prohibits the conduct at issue" for these actions. <u>See</u> <u>Margiotta</u>, 315 S.W.3d at 347. "When the defendant's actions are within a category not generally considered actionable (such as discharge of an at-will employee), the specific facts on which liability is based must be pleaded with particularity." <u>Frevert</u>, 614 F.3d at 472 (quoting <u>Adolphsen v.</u> <u>Hallmark Cards, Inc.</u>, 907 S.W.2d 333, 338 (Mo. Ct. App. 1995)). Plaintiff's wholesale assertion

that the twenty-one legal provisions cited in the Petition prohibit the actions he contends were illegal requires the Court to examine each of the authorities cited in the Petition.

As a threshold procedural matter, the Court will not consider in its analysis the provisions of the JAFAN Manual, DoD Manual, and NISPOM cited by Boeing in the motion to dismiss, but which are not specifically referenced in the Petition. It is certainly arguable these additional provisions of manuals cited in the Petition could be considered as matters embraced by the Petition's allegations, or as matters of public record whose authenticity has not been questioned, such that their consideration would not convert the motion to dismiss to one for summary judgment. See, e.g., Johnson v. Perdue, 862 F.3d 712, 715 (8th Cir. 2017). The parties have not addressed this procedural issue, and plaintiff has raised no objection to consideration of the additional provisions, but the Court concludes it is not necessary to consider the additional provisions to resolve the motion to dismiss.

As a threshold merits matter, the Court rejects Boeing's argument that plaintiff cannot establish a wrongful discharge claim as a matter of law because the federal regulations and guidance for access to highly classified SAP programs do not give rise to any public policy mandate applicable to the population at large in Missouri. Boeing's argument is entirely unsupported by citation to any legal authority, and the Court is unaware of any such authority.[11]

---

[11]The Court notes the Missouri wrongful discharge doctrine has been held applcable where a plaintiff reported violations of, or refused to violate, federal law or regulations. See, e.g., Fleshner, 304 S.W.3d at 96-97 (plaintiff engaged in activity protected by Missouri public policy where she spoke with a federal labor investigator in connection with an investigation into employer's possible failure to pay overtime compensation as required by federal law); see also Boyle v. Vista Eyewear, Inc., 700 S.W.2d 859, 870 (Mo. Ct. App. 1985) (plaintiff stated a wrongful discharge claim where she refused to violate FDA regulations).

a. <u>Debriefing While Plaintiff's SAP Access Was Suspended</u>

Plaintiff's first allegation is that it would be illegal for him to debrief, or for Boeing to debrief him, while his SAP access was suspended. Pet. ¶¶ 101.a., 102. In support, the Petition asserts that the NISPOM, the NISPOM Supplement, and the SAP Security Manual (DoD Manual 5205.07) define "debriefings," and describe what they consist of, how they are performed, when they are performed and where they are to take place. Pet. ¶ 51.

The NISPOM Supplement defines a debriefing as "[t]he process of informing a person his need-to-know for access is terminated." Pet. ¶ 52. The Petition quotes NISPOM §3-108 and asserts that it states when debriefing can take place:

> Contractors shall debrief cleared employees at the time of termination of employment (discharge, resignation or retirement); when an employee's PCL [personal security clearance] is terminated, suspended or revoked; and upon termination of the FCL [Facility Security Clearance].

Pet. ¶ 53.

The language of NISPOM §3-108 provides that contractors shall debrief a cleared employee when the employee's personal clearance is "terminated, suspended or revoked." Plaintiff argues that Boeing violated NISPOM §3-108 by debriefing him even though his employment was not terminated, his personal security clearance—as distinguished from his SAP access—had not been terminated, suspended, or revoked, and Boeing's Facility Security Clearance was not terminated. Under plaintiff's interpretation, NISPOM §3-108 prohibits a contractor from debriefing an employee unless one of the three situations it specifically addresses exists. Plaintiff argues that because none of those situations existed at the time Boeing demanded he debrief, NISPOM §3-108 prohibited Boeing from debriefing plaintiff while his SAP access was suspended.

The fatal flaw in the Petition and plaintiff's argument is that the language of NISPOM §3-108 does not "clearly prohibit" Boeing from debriefing plaintiff while his SAP access was suspended. As a result, plaintiff's wrongful discharge claim based on this regulation must fail. Margiotta, 315 S.W.3d at 347. Plaintiff's legal conclusion as to the meaning of the regulation is not accepted as true on a motion to dismiss, Iqbal, 556 U.S. at 678, and plaintiff's interpretation is unreasonable. By its language, NISPOM §3-108 addresses when a contractor "shall" debrief an employee. The use of the word "shall" generally indicates that what follows is mandatory. See, e.g., Hennepin County v. Federal Nat'l Mortgage Ass'n, 742 F.3d 818, 822 (8th Cir. 2014) ("use of 'shall' in a statute makes what follows mandatory."). NISPOM §3-108 specifies the circumstances under which a contractor *is mandated* to debrief employees, but it does not address all potential debriefings. NISPOM §3-108 does not mention SAP access, or debriefing in the SAP context, at all.

None of the other legal provisions cited in the Petition "clearly prohibit" a person whose SAP access has been suspended, but whose personal security clearance remains in effect, from being debriefed. Similarly, none of these provisions "clearly prohibit" debriefing a person whose SAP access has been suspended, but whose personal security clearance remains in effect.

It is important to recognize that the Petition only provides the actual language of a few of the numerous legal provisions it cites. In addition to NISPOM §3-108, the Petition quotes NISPOM Supplement §3-104, which "defines who is to do the debriefing and what it shall consist of:"

> **Debriefing and/or Access termination**. Persons briefed to SAP's will be debriefed by the CPSO [Contractor/Command Program Security Officer] or his designee. The debriefing will include as a minimum a reminder of each individual's responsibilities according to the NDA which states that the individual has no Program or Program-related material in his/her possession, and that he/she understands his/her responsibilities regarding the disclosure of classified Program information.

Pet. ¶ 55.  The Petition alleges that SAP debriefings are "similarly defined by the DoD Manual 5205.07, SAP Security Manual, Vol., 2, Encl. 3, Sec. 13, (Nov 24, 2015)."  Pet. ¶ 56.  The Petition also alleges that "NISPOM Supplement §3-104 states where debriefings should take place" and quotes it:

> Debriefings should be conducted in SAPF [Special Access Program Facility] Sensitive Compartmented Information Facility or other secure area where possible, or as authorized by the PSO [Program Security Officer.]

Pet. ¶ 58.  The Petition alleges that JAFAN 6/0, §3-102 similarly states, "Debriefings will be conducted in a SAPF or other secure area when possible, as authorized by the PSO."  Id.

Nothing in the language of NISPOM Supplement §3-104 or JAFAN 6/0, §3-102 "clearly prohibits" plaintiff from participating in a debriefing while his SAP access was suspended, or "clearly prohibits" Boeing from debriefing plaintiff while his SAP access was suspended. Therefore, these regulations do not support plaintiff's wrongful discharge claim.

The Petition also quotes NISPOM §§ 6-201.b and 6-201.c(2), describing these as "very specific regarding where classified information at various levels may be discussed, and what the requirements are for any persons who are in attendance when classified information is discussed:"

> **Location of meetings**.  Classified sessions shall be held only at a Federal Government Installation or a cleared contractor facility where adequate physical and procedural controls have been approved. The authorizing government agency is responsible for evaluating and approving the location of the proposed meeting.

> **Clearance and Need-to-know**. All persons in attendance at classified sessions shall possess the requisite clearance and need to know for the information to be disclosed. Need-to-know shall be determined by the authorizing agency or its designee based on the justification provided.  Attendance shall be authorized only to those persons whose security clearance and justification for attendance have been verified by the security officer of the organization represented.  The names of all authorized attendees or participants must appear on an access list with entry permitted to the classified session only after verification of the attendees' identity based on

presentation of official photographic identification such as a passport, contractor or U.S. Government identification card.

Pet. ¶ 59. Nothing in the language of NISPOM §§ 6-201.b and 6-201.c(2) addresses debriefing, however, and instead concerns "classified sessions," which the Petition does not define. These regulations do not "clearly prohibit" plaintiff from participating in a debriefing while his SAP access was suspended, or "clearly prohibit" Boeing from debriefing plaintiff while his SAP access was suspended, and therefore do not support plaintiff's wrongful discharge claim.

The Petition also cites other legal provisions in support of plaintiff's claim but quotes only single sentences or sentence fragments from these provisions. See Pet. ¶¶ 60, 102.c, 102.c.1., 102.c.2, 102.c.3, 102.e.i, 102.e.ii, 102.f., 102.h, 102.k.i, 102.k.ii. None of the quoted language from any of these legal provisions "clearly prohibits" plaintiff from being debriefed while his SAP access was suspended, or "clearly prohibits" Boeing from debriefing plaintiff while his SAP access was suspended. Further, in most instances it is not possible to determine the overall meaning or context of the regulations from which the quoted language was taken. Therefore, these provisions do not support plaintiff's wrongful discharge claim.

In other instances, the Petition refers to legal provisions as supporting plaintiff's claim but does not quote the language of the provisions at all, and instead consists of plaintiff's paraphrasing of that language or, perhaps, plaintiff's interpretation of or legal conclusions as to what the provisions state or mean. See, e.g., Pet. ¶¶ 57, 102.b., 102.b.1., 102.b.2., 102.g., 102.i.1, 102.i.2, 102.i.3, 102.j. Plaintiff's paraphrasing or legal conclusions as to the meaning of these provisions are not accepted as true on a motion to dismiss. Iqbal, 556 U.S. at 678. Therefore, it does not appear from the face of the Petition that any of the legal provisions listed in this paragraph "clearly prohibit" plaintiff from being debriefed while his SAP access was suspended, or "clearly prohibit"

36

Boeing from debriefing plaintiff while his SAP access was suspended. Consequently, these paraphrased legal provisions do not support plaintiff's wrongful discharge claim.

Some legal provisions cited in the Petition are too vague or general to be successfully pled under a wrongful discharge theory, because they would force the Court to decide on its own what public policy requires. See Pet. ¶¶ 102.c., Executive Order 13526 ("the national defense has required that certain information be maintained in confidence in order to protect our citizens, our democratic institutions, our homeland security, and our interactions with foreign nations."); 102.e.i., DoD Instruction 5205.11 §3(c) ("DoD SAPs must be protected at all times consistent with their classification and sensitivity."). Cf. United States ex rel. Miller v. Weston Educ., Inc., 840 F.3d 494, 507-08 (8th Cir. 2016) (federal regulations providing that certain educational institutions are liable for "[i]mproperly spent or unspent funds," and are fiduciaries subject to "the highest standard of care and diligence," do not involve clear public policy and offer only general standards); Margiotta, 315 S.W.3d at 348 (finding regulation providing "patient has the right to receive care in a safe setting" too vague to support clear public policy).

Finally, the Petition cites as a legal provision the "written directive (**Exhibit A**) from AFOSI to Boeing not to debrief [plaintiff] and that [plaintiff's] SAP access was suspended." Exhibit A, the AFOSI Memo dated December 20, 2013, states in pertinent part:

> 1. This is to inform you there is an on-going AFOSI Investigation involving [plaintiff] from the BOEING COMPANY, SAINT LOUIS. [Plaintiff's] access to all Special Access Programs (SAPs) information and areas under AFOSI security cognizance is removed. [Plaintiff] will remain in this status pending the completion and review of the AFOSI investigation. This action is temporary and not authorization to debrief [plaintiff].

Pet., Ex. A.

The AFOSI Memo does not support plaintiff's wrongful discharge claim, as it does not constitute "explicit authority" involving a clear mandate of public policy and does not cite to any other source of a clear mandate of public policy. See Frevert, 614 F.3d at 471. Generally "public policy must be found in a constitutional provision, a statute, [a] regulation promulgated pursuant to statute, or a rule created by a governmental body." Fleshner, 304 S.W.3d at 96. This notification memorandum, by itself, does not rise to the level of a well established and clearly mandated public policy on which a wrongful discharge claim can be based. Cf. Frevert, 614 F.3d at 471, 472-73 (court does not err in dismissing claim where plaintiff "fail[s] to identify any specific statute, constitutional provision, or regulation that was violated," (quoted case omitted); fired employee's allegations that he reported violations of company's internal policies were insufficient to state a claim for wrongful discharge). Plaintiff therefore fails to state a claim of wrongful discharge based on the AFOSI Memo.

Further, assuming for purposes of argument that the AFOSI Memo was a source of public policy, contrary to plaintiff's characterization, the Memo does not facially prohibit Boeing from debriefing plaintiff. The Memo states only that it is "not authorization to debrief" plaintiff. Thus, the Memo does not "clearly prohibit" Boeing from debriefing plaintiff while his SAP access was suspended, or "clearly prohibit" plaintiff from being debriefed while his SAP access was suspended. As a result, plaintiff fails to state a claim upon which relief can be granted. See Margiotta, 315 S.W.3d at 347,

Finally, assuming further for purposes of argument that the AFOSI Memo was a source of public policy and prohibited Boeing from debriefing plaintiff, by the Memo's terms the prohibition would have ended when the AFOSI investigation was completed. The Petition alleges that AFOSI's investigation was completed in 2014 or 2015, Pet. ¶¶ 42, 44, 44.b., 48, and that Boeing's demands

to debrief plaintiff began in late 2015. See Pet. ¶ 61, Ex. B (letter from Sanford J. Boxerman, plaintiff's attorney, to Kenneth L. Heininger, Boeing attorney (Nov. 3, 2015)).

Because the Petition does not identify on its face any clear mandate of established public policy that prohibited plaintiff from debriefing while his SAP access was suspended, or prohibited Boeing from debriefing plaintiff while his SAP access was suspended, plaintiff's assertion that he could not be debriefed because he would not be able to ask substantive questions and receive substantive answers about highly classified SAP information from the person providing the debriefing does not compel a different result. The assertion lacks support in the applicable regulations.

The Petition alleges that at the time of debriefing, the debriefed individual is, among other things, "given the ability to ask questions and receive substantive answers from the person providing the debriefing." Pet. ¶ 57 (citing JAFAN 6/0 Manual, §3-102 (May 29, 2008) and DoD Manual 5205.07, SAP Security Manual, Vol. 2, Encl. 3, Sec. 13, (Nov 24, 2015)). As previously discussed, however, the Petition does not quote the language of these regulations but merely offers plaintiff's interpretation of them. A regulation that is quoted in the Petition, NISPOM Supplement §3-104, establishes the minimum requirement for a debriefing:

> **Debriefing and/or Access termination**. Persons briefed to SAP's will be debriefed by the CPSO [Contractor/Command Program Security Officer] or his designee. *The debriefing will include as a minimum* a reminder of each individual's responsibilities according to the NDA [nondisclosure agreement] which states that the individual has no Program or Program-related material in his/her possession, and that he/she understands his/her responsibilities regarding the disclosure of classified Program information.

Pet. ¶ 55 (emphases added). This regulation specifies the minimum content of a debriefing, and does not include a requirement that the debriefed person be able to ask substantive questions and receive

substantive answers about highly classified SAP information.[12]  It therefore does not support plaintiff's wrongful discharge claim.

For these reasons, plaintiff's Petition does not affirmatively show on its face that plaintiff would have violated the law and well established and clearly mandated public policy if he had debriefed while his SAP access was suspended, or that Boeing's action demanding that plaintiff debrief while his SAP access was suspended actually "constitutes a violation of the law and of *well established* and *clearly mandated* public policy."  Frevert, 614 F.3d at 471.  The Petition does not cite to authority that "clearly prohibits" this conduct by either plaintiff or Boeing, and therefore this aspect of plaintiff's wrongful discharge action fails to state a claim upon which relief can be granted. See Margiotta, 315 S.W.3d at 347.

### b. Entering a SAP Facility While Plaintiff's SAP Access Was Suspended

Plaintiff's second allegation is that it was illegal for him to enter a SAP Facility ("SAPF") even with an escort while his SAP access was suspended, or for Boeing to direct him to enter a SAPF with an escort while his SAP access was suspended.  Pet. ¶¶ 101.b., 102, Ex. B at 1.  As discussed above, the Petition quotes several portions of the NISPOM and NISPOM Supplement in support of plaintiff's wrongful discharge claim.  NISPOM §3-108, which specifies when debriefings "shall" take place, see Petition ¶ 53, does not address SAPFs and therefore is not relevant to this allegation.

---

[12]In addition, plaintiff offers no authority to support his assertion that "substantive questions" and "substantive answers" would necessarily involve discussion of highly classified SAP information.  Plaintiff's assertion appears contrary to the principles announced by the Supreme Court in Egan, which held that no one has a right to a security clearance or to access classified information.  484 U.S. at 528-29.

The Petition also cites NISPOM Supplement §3-104, which "states where debriefings should take place:"

> Debriefings should be conducted in SAPF [Special Access Program Facility] Sensitive Compartmented Information Facility or other secure area where possible, or as authorized by the PSO [Program Security Officer.]

Pet. ¶ 58. The Petition alleges that JAFAN 6/0, §3-102 similarly states, "Debriefings will be conducted in a SAPF or other secure area when possible, as authorized by the PSO." Id.

Nothing in the language of NISPOM Supplement §3-104 or JAFAN 6/0, §3-102, "clearly prohibits" plaintiff from entering a SAPF with an escort for debriefing while his SAP access was suspended, or "clearly prohibits" Boeing from directing plaintiff to enter a SAPF with an escort for debriefing while his SAP access was suspended. To the contrary, these regulations state that debriefings *should* be conducted in a SAPF, Secure Compartmented Information Facility, or other secure area. Notably, NISPOM §3-108 mandates that contractors debrief persons whose personal security clearances have been revoked, suspended, or terminated. Thus, the regulations plaintiff relies upon, when read together, specifically authorize persons *with less clearance authorization than plaintiff* to enter SAPFs or other secure areas for debriefing.[13] NISPOM Supplement §3-104 and JAFAN 6/0, §3-102 do not prohibit plaintiff from entering a SAPF while his SAP access was suspended, and therefore do not support his wrongful discharge claim.

Also relevant to this aspect of plaintiff's claim, the Petition quotes NISPOM §§ 6-201.b and 6-201.c(2) and describes these regulations as "very specific regarding where classified information at various levels may be discussed, and what the requirements are for any persons who are in attendance when classified information is discussed:"

---

[13]As stated above, plaintiff retained his personal security clearance while his SAP access was suspended.

**Location of meetings**. Classified sessions shall be held only at a Federal Government Installation or a cleared contractor facility where adequate physical and procedural controls have been approved. The authorizing government agency is responsible for evaluating and approving the location of the proposed meeting.

**Clearance and Need-to-know**. All persons in attendance at classified sessions shall possess the requisite clearance and need to know for the information to be disclosed. Need-to-know shall be determined by the authorizing agency or its designee based on the justification provided. Attendance shall be authorized only to those persons whose security clearance and justification for attendance have been verified by the security officer of the organization represented. The names of all authorized attendees or participants must appear on an access list with entry permitted to the classified session only after verification of the attendees' identity based on presentation of official photographic identification such as a passport, contractor or U.S. Government identification card.

Pet. ¶ 59. Nothing in the language of NISPOM §§ 6-201.b or 6-201.c(2) addresses the topic of debriefing. Instead, these regulations discuss "classified sessions," which the Petition does not define. Thus, the regulations do not "clearly prohibit" plaintiff from entering a SAPF with an escort for debriefing while his SAP access was suspended, or "clearly prohibit" Boeing from escorting plaintiff to a SAPF for debriefing while his SAP access was suspended, and therefore do not support plaintiff's wrongful discharge claim.

Further, for the reasons discussed above, the Petition does not establish that plaintiff had any right to discuss classified information at the debriefing. Instead, the Petition quotes the NISPOM Supplement as defining a "debriefing" as "[t]he process of informing a person his need-to-know for access is terminated," Pet. ¶ 52, and quotes NISPOM Supplement §3-104, which states only that "a debriefing will include as a minimum a reminder of each individual's responsibilities according to the NDA which states that the individual has no Program or Program-related material in his/her possession, and that he/she understands his/her responsibilities regarding the disclosure of classified Program information." Pet. ¶ 55.

As discussed more fully above, the Court finds that none of the other legal provisions cited in the Petition support this aspect of plaintiff's wrongful discharge claim, because they (1) are either uncontextualized single sentences or sentence fragments that do not "clearly prohibit" plaintiff from entering a SAPF with an escort for debriefing while his SAP access was suspended, or "clearly prohibit" Boeing from escorting plaintiff to a SAPF for debriefing while his SAP access was suspended; (2) consist of plaintiff's paraphrasing of or legal conclusions as to the meaning of regulations whose language is not quoted in the Petition; or (3) are too vague or general to be successfully pled under a wrongful discharge theory.

For these reasons, plaintiff's Petition does not affirmatively show on its face that it would have been illegal for plaintiff to enter a SAPF with an escort while his SAP access suspended, or that Boeing's demand that plaintiff enter a SAPF with an escort for debriefing while his SAP access was suspended actually "constitute[d] a violation of the law and of *well established* and *clearly mandated* public policy." Frevert, 614 F.3d at 471. The Petition does not cite to authority that "clearly prohibits" this conduct, and therefore this aspect of plaintiff's wrongful discharge action fails to state a claim upon which relief can be granted. See Margiotta, 315 S.W.3d at 347.

c. Debriefing From the SAP Program and Entering a SAP Facility While Plaintiff's SAP Access Was Suspended, After AFOSI Notified Boeing That Plaintiff's SAP Access Was Suspended and That It Was Not Authorized to Debrief Him

Plaintiff's third allegation is that it was illegal for him to be debriefed and to enter a SAPF after his SAP access was suspended and Boeing had been notified by AFOSI that plaintiff's SAP access was suspended and it was not authorized to debrief him; and that it was illegal for Boeing to debrief him, and to direct him to enter a SAP Facility, after AFOSI notified Boeing that plaintiff's SAP access was suspended and that it was not authorized to debrief plaintiff. Pet. ¶¶ 101.c., 102.

The Court has concluded the Petition does not establish that it was illegal for plaintiff to be debriefed, or for Boeing to debrief plaintiff, while plaintiff's SAP access was suspended, *supra* at 40. The Court has also concluded the Petition does not establish that it was illegal for plaintiff to enter a SAPF with an escort, or for Boeing to direct plaintiff to enter a SAPF with an escort, while his SAP access was suspended, *supra* at 43. The Court now examines the final aspect of plaintiff's claim, that it was illegal for him to be debriefed and to enter a SAPF while his SAP access was suspended, and for Boeing to debrief plaintiff and to direct him to enter a SAPF while his SAP access was suspended, after AFOSI had notified Boeing that plaintiff's SAP access was suspended and that it was not authorized to debrief plaintiff.

The Petition alleges that the AFOSI Memo to Boeing dated December 20, 2013, stated that "Boeing was <u>not</u> authorized to debrief [plaintiff]." Pet. ¶ 50. The Petition also alleges that AFOSI "expressly ordered" or "instructed" Boeing not to debrief plaintiff. <u>See</u>, <u>e.g.</u>, Pet. ¶¶ 66, 69.a., 101.c, 102, 102.a.2., 102.a.3, 102.a.4. As previously stated, the AFOSI Memo is attached to the Petition as Exhibit A, and provides in pertinent part:

> 1. This is to inform you there is an on-going AFOSI Investigation involving [plaintiff] from the BOEING COMPANY, SAINT LOUIS. [Plaintiff's] access to all Special Access Programs (SAPs) information and areas under AFOSI security cognizance is removed. [Plaintiff] will remain in this status pending the completion and review of the AFOSI investigation. This action is temporary and not authorization to debrief [plaintiff].

Pet., Ex. A.

As previously discussed, the AFOSI Memo does not support plaintiff's wrongful discharge claim, as it does not constitute "explicit authority" involving a well established and clear mandate of public policy, nor does it cite to any source of a clear mandate of public policy. <u>See</u> <u>Frevert</u>, 614 F.3d at 471. Generally "public policy must be found in a constitutional provision, a statute, [a]

regulation promulgated pursuant to statute, or a rule created by a governmental body." <u>Fleshner</u>, 304 S.W.3d at 96. This notification Memorandum, by itself, does not rise to the level of a legal provision on which a public policy wrongful discharge claim can be based. <u>Cf.</u> <u>Frevert</u>, 614 F.3d at 471, 472-73 (court does not err in dismissing claim where plaintiff "fail[s] to identify any specific statute, constitutional provision, or regulation that was violated;" fired employee's allegations that he reported violations of company's internal policies were insufficient to state a claim for wrongful discharge).[14]

For these reasons, plaintiff's Petition does not affirmatively show on its face that plaintiff's debriefing or entering a SAPF with an escort for debriefing while his SAP access was suspended, after Boeing received the AFOSI Memo, or that Boeing's demand that plaintiff debrief or enter a SAPF with an escort for debriefing while his SAP access was suspended, after Boeing received the AFOSI Memo stating that plaintiff's SAP access was suspended and that the Memo was not authorization to debrief plaintiff, actually "constitutes a violation of the law and of *well established* and *clearly mandated* public policy." <u>Frevert,</u> 614 F.3d at 471. The Petition does not cite to any authority that "clearly prohibits" this conduct, and therefore this aspect of plaintiff's wrongful discharge action fails to state a claim upon which relief can be granted. <u>See</u> <u>Margiotta</u>, 315 S.W.3d at 347.

**IV. Conclusion**

For the reasons discussed above, the Court concludes that it has subject matter jurisdiction over plaintiff's Petition for Wrongful Discharge (Public Policy Exception). The Court further

---

[14]The Court's additional grounds for concluding that plaintiff cannot state a claim for wrongful discharge based on the AFOSI Memo to Boeing, discussed *supra* at 38-39, are included in its analysis of plaintiff's third allegation by this reference, but are not repeated here.

concludes that plaintiff's Petition fails to state a claim upon which relief can be granted under Missouri's wrongful discharge doctrine, because the Petition on its face does not cite authority showing plaintiff was terminated for refusing to violate the law or any well-established and clear mandate of public policy that clearly prohibited the conduct at issue in this action. Defendant Boeing's motion to dismiss for lack of subject matter jurisdiction will therefore be denied and its alternative motion to dismiss pursuant to Rule 12(b)(6) will be granted.

Accordingly,

**IT IS HEREBY ORDERED** that the stay previously imposed in this matter is lifted.

**IT IS FURTHER ORDERED** that defendant The Boeing Company's Motion to Dismiss is **GRANTED in part** and **DENIED in part**; the motion is **DENIED** to the extent it seeks dismissal for lack of subject matter jurisdiction under Rule 12(b)(1), and **GRANTED** as to the alternative motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6). [Doc. 17]

An Order of Dismissal will accompany this Memorandum and Order.

**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**

Dated this _30th_ day of March, 2018.